**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Larry HAMMOND, a/k/a Larry Hoover, Defendant-Appellant.**

No. 78–5179.

United States Court of Appeals, Fifth Circuit.

July 16, 1979.

Morton Berger, Spring Valley, N. Y., for defendant-appellant.

Charles O. Farrar, Jr., Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before WISDOM, GOLDBERG and VANCE, Circuit Judges.

GOLDBERG, Circuit Judge:

The defendant-appellant was convicted in federal district court of wire fraud and securities fraud in violation of 18 U.S.C. § 1343, 15 U.S.C. §§ 78j(b) and 78 ff, and 17 C.F.R. 24.10b–5. On appeal he raises several arguments challenging his convictions. For the reasons stated below, we conclude

that the judgment of the district court should be reversed.

The defendant's convictions resulted from his participation in a scheme to defraud a brokerage house. An FBI undercover agent named Peisner played a part in the scheme. The defendant believed Peisner was a person who had good credit but was about to declare bankruptcy. Under the scheme, Peisner was to order his brokerage house to purchase for him on credit 150,000 shares of stock in I & I, Inc. The defendant allegedly controlled this stock. Although the stock was traded at $3 per share, it was actually worthless. The scheme was to work as follows: After the brokerage house purchased the stock, Peisner would renege on his agreement and declare bankruptcy. The money from the stock purchase would find its way to the defendant, the defendant would pay Peisner $25,000 for his efforts, and the brokerage house would be left with the worthless stock. The deal, however, was not completed. Peisner informed the Securities and Exchange Commission, and it suspended trading in the stock. The defendant was indicted for his activities in connection with the scheme, and on the basis of his participation, the jury found him guilty of wire fraud and securities fraud.

## I.

■ The defendant's first argument on appeal concerns his convictions under the federal wire fraud statute. ("§ 1343"). That statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1343. In this case, the wire fraud convictions were based on telephone calls between the defendant and agent Peisner in which they discussed the plans for defrauding the brokerage house.

The defendant argues that the trial court lacked subject matter jurisdiction for the two wire fraud convictions. He claims that the jurisdictional element of § 1343 cannot be met when that element is supplied, as it was in this case, solely by contacts between the defendant and government agents. There are two steps to the defendant's argument. First, he claims that the requisite interstate or foreign communication must be "in furtherance of" the defendant's scheme to defraud. And, second, he argues that a communication cannot be "in furtherance of" the scheme to defraud if it is made to a government agent who secretly intends to frustrate the scheme. In other words, the defendant would interpret § 1343 as requiring an interstate or foreign communication which actually furthers the scheme to defraud.

The defendant's interpretation of § 1343 is incorrect. Section 1343 does not provide that the interstate or foreign communication must be "in furtherance of" the scheme to defraud. It only provides that the communication must be made "for the purpose of executing such scheme." 18 U.S.C. § 1343. And one can certainly make a communication for the purpose of executing a scheme, even when that communication does not actually further the scheme. In fact, our recent decision in *United States v. Patterson,* 528 F.2d 1037 (5th Cir. 1976), establishes that § 1343 only requires that the defendant transmit or cause to transmit an interstate or foreign communication, *intending* that the communication will help further the scheme. There is no requirement that the communication *actually* further the scheme.

In *Patterson* the defendant's scheme was to defraud the phone company by selling electronic devices called "blue boxes." When a blue box is attached to the phone one can make long distance calls without being charged by the phone company. To

demonstrate how the device worked, the defendant dialed the long distance operators in several cities. The defendant was unaware when he made this demonstration that his potential customer was a telephone security agent. The court held that these calls fell within § 1343. Although the calls did not actually defraud the phone company, since they were not toll calls, they were made "for the purpose of executing" the fraudulent scheme because they were made to demonstrate the blue box to a potential customer. It did not matter that this potential customer was someone who secretly intended to frustrate the scheme. *Id.*

When the defendant in this case talked on the phone with agent Peisner, the defendant was unaware that Peisner was an FBI agent. He thought of Peisner as his accomplice in the scheme, and in these phone calls, the defendant explained to Peisner exactly what he was supposed to do. Clearly, then, the defendant made these phone calls *intending* that they would help execute the scheme to defraud the brokerage house. As *Patterson* shows, this is sufficient to bring the calls within § 1343.

## II.

■ The defendant's second argument concerns his entrapment defense. Under the law of entrapment, once the defendant shows some evidence that the government induced him to commit the offense, the burden is on the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. *United States v. Benavidez,* 558 F.2d 308, 310 (5th Cir. 1977) *United States v. Timberlake,* 559 F.2d 1375, 1379 (5th Cir. 1977). In this way the government proves that the defendant was not entrapped.

■ In this case the defendant presented evidence of government inducement. A stipulation containing the testimony of two absent defense witnesses was read to the jury. It indicated that the government thought up the scheme to defraud the brokerage house. According to these witnesses, government agents were going to "push" the scheme on the defendant. The witnesses claimed that the defendant was "unwilling to do the deal that way." The government agents were going to set the defendant up to get even with him "because of a prior deal." [1] With the introduction of this evidence, the burden was on the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the offenses.

■ This, the defendant claims, the government did not do. The jury, however, thought otherwise. And, after examining the record, we find that there was evidence from which a jury could conclude beyond a reasonable doubt that the defendant was predisposed to commit the offenses.

There was evidence that the defendant controlled the I & I stock and that the stock, although traded at $3 per share, was actually worthless. The evidence also showed that prior to his dealings with agent Peisner, the defendant had tried to get various individuals to purchase the stock without telling them that he controlled the stock or that it was worthless. Instead, the defendant told these individuals that he knew the stock was going to rise in value. He gave different explanations for this expected rise in value. He told these individuals that he wanted to buy the stock himself but that he did not then have the cash. He asked the prospective purchasers to buy the stock and hold it so that he could later purchase it from them. All the prospective purchasers rejected the deal.

From this evidence the jury could have concluded that before meeting agent Peisner the defendant was planning to defraud *someone* by causing him to purchase the worthless stock. Moreover, according to agent Peisner, it was the defendant's idea, not the government's to defraud the brokerage house. Peisner testified that he arranged to meet the defendant, posing as a person with good credit but who was about to declare bankruptcy, because he had learned that the defendant was looking for

1. The complete stipulation is quoted in footnote 5.

just such a person to perpetrate a fraud against a brokerage house. From all this evidence, a jury could conclude beyond a reasonable doubt that the defendant was predisposed to commit the offense.

### III.

Finally, the defendant argues that the trial court should have dismissed the case because the government intimidated his witnesses.[2] He claims that the government's intimidation of two important defense witnesses caused them to refuse to testify.

One of these witnesses, Mr. Parsons, had already testified and been cross-examined when the court called a recess. During this recess, FBI agent Peisner approached Parsons. Peisner told Parsons that he knew about the "situation in Colorado." Parsons had been indicted in a state matter in Colorado and had agreed to go there to work with the FBI in an assistance capacity. Peisner told Parsons that if he "continued on," he would have "nothing but trouble" in Colorado. The next morning both Parsons and the other defense witness, who had not yet given any testimony, were subpoenaed to appear before a grand jury for further investigation of the I & I stock.

After these events, Parsons refused to give further testimony and the other defense witness refused to testify at all. The parties informed the court about what had transpired. Parsons told the judge that he feared that if he testified, the government would hurt him in his Colorado trial. According to the defense attorney, the other witness refused to testify because of the subpoena and because he had learned of the conversation between Parsons and Peisner.

---

2. The defendant also claims that there was insufficient evidence to support the verdict. Parts I and II of the opinion show that this claim is without merit. Accordingly, we hold that there was sufficient evidence to support the verdict.

3. This right "to present witnesses to establish a defense" is specifically found in the sixth amendment right to compulsory process. *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, in

At the court's suggestion, the parties agreed to stipulate to what the two witnesses would have said had they taken the stand. The judge read the stipulation to the jury, advising the jurors that they had to give the stipulated testimony the same weight as they would have given live testimony. The stipulation contained the testimony of government inducement discussed in part II. The gist of the testimony was that government agents planned to "push" the scheme to defraud the brokerage house on the "unwilling" defendant.

 The Supreme Court has recognized that a criminal defendant has a constitutional right to "present his own witnesses to establish a defense." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). This right is an element of due process of law guaranteed the defendant by the due process clause.[3] Cases have held that various types of governmental interference can deprive the defendant of this right. *E. g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (defense witness intimidated by remarks of trial judge); *United States v. Henricksen,* 564 F.2d 197 (5th Cir. 1977) (defense witness intimidated by terms of plea bargain); *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976) (defense witness intimidated by remarks by assistant United States attorney); *United States v. Thomas,* 488 F.2d 334 (6th Cir. 1973) (defense witness intimidated by remarks of secret service agent involved in the case). This circuit recently stated the rule as follows, "substantial government interference with a defense witness' free and unhampered choice to testify violates due process" rights of the defendant. *United States v. Henricksen,* 564 F.2d 197 (5th Cir. 1977).

*Washington v. Texas,* the Supreme Court held that the right was so fundamental to a fair trial that it was incorporated in the Due Process Clause of the fourteenth amendment. *Id.* Cases, since then, have been based on due process rights without reference to the sixth amendment. *E. g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *United States v. Henricksen,* 564 F.2d 197 (5th Cir. 1977). We will likewise refer to this right as a due process right.

■ In this case, it was certainly reasonable for defense witness Parsons to interpret agent Peisner's comments as threats to retaliate if Parsons continued to testify. Because of these comments, Parsons did refuse to testify. Accordingly, we find that agent Peisner's comments constituted a "substantial governmental interference" with defense witness Parson's "free and unhampered choice to testify." We therefore conclude that this governmental interference deprived the defendant of his due process right to present his witnesses. Because we hold that this due process violation requires reversal, we do not reach the question of whether, under the circumstances of this case, the government's issuance of the subpoenas also violated the defendant's due process rights.

The government claims that the due process violation in this case should not require reversal. It argues that the defendant was not prejudiced by this constitutional violation and that under the harmless error rule we should affirm the judgment of the district court. The defendant claims that he was prejudiced. But he also argues that we must reverse the judgment even absent any showing of prejudice; he argues that the harmless error rule is inapplicable to this constitutional violation.

This argument is based on the Supreme Court's per curiam decision in *Webb v. Texas,* 409 U.S. 91, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). In *Webb* the Court held that the trial judge's threatening remarks, directed only at the sole defense witness, effectively drove that witness off the stand and thus deprived the defendant of his due process rights. The majority reversed the defendant's burglary conviction because of this constitutional violation. Justice Blackmun wrote a dissent in which Justice Rehnquist joined. While the dissent agreed that the trial judge's remarks were improper, it thought the majority was wrong to summarily reverse the case *without determining whether the defendant was actually prejudiced by the error.* The dissent noted that although there was "overwhelming evidence of guilt" in this case, the majority nonetheless accepted only a "bare allegation of prejudice." *Id.* 93 S.Ct. at 354.

■ On the basis of *Webb,* both the third and the sixth circuits have stated that they would not require a finding of prejudice in order to reverse a conviction because of this type of due process violation. *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976); *United States v. Thomas,* 488 F.2d 334 (6th Cir. 1973). We agree with their analysis of *Webb* and hold that this type due process violation is harmful per se.

We find a great deal of support for this interpretation of *Webb.* The Supreme Court has previously held that there are some constitutional violations to which the harmless error rule does not apply, *see Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, n.8 (1967), and we feel that this constitutional violation is a prime candidate for such treatment. One reason is that this due process violation will almost always be harmful, and it will be very difficult for a court to determine when it is not. This is because a court will seldom be able to determine exactly what evidence would have been brought out had the witness been allowed to testify freely. Furthermore, since a constitutional violation is involved, a court would have to be able to conclude that the absence of this unknown testimony was harmless beyond a reasonable doubt. *Id.* Even if a court could say with the requisite certainty that the omitted testimony would not have changed the outcome of the case, the defendant still should be allowed to attempt to change that outcome by presenting his witnesses. A final reason supports our conclusion. We cannot imagine that such a violation of due process would result from anything but intentional conduct on the part of the government, and a per se rule would be the best deterrent to such conduct.

■ *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), may open a hatch for harmless constitutional error to appear, but its aperture is not so gargantuan that constitutional rights are minimized to infinitesimality. We must be

confident that the scales of justice are not tilted, are not skewed. The *Chapman* harmless error rule was not intended to be a cover-up for every prosecutorial error. It was really intended as a Band-Aid for what is, under the circumstances, a minor, albeit constitutional, legal abrasion. The constitution speaks in cosmic concepts or cosmic principles, and they are not to be grudgingly applied nor miniaturized. We must be careful lest the purgatory of the harmless error doctrine erode our sacred constitutional rights.

 Even if the harmless error rule were applicable to this due process violation, we would still reverse the judgment of the district court. The testimony of the two defense witnesses was very important to the defendant's entrapment defense since it refuted the government's evidence of predisposition. This important testimony would have been more effective had it not been introduced by stipulation.[4] Certainly, live testimony can have more impact than a statement read to the jury. A stipulation is static and deprived of vitality. It is a synthetic substitute for the oracular declarations of a witness. The written word with its depersonalization can be no equal to verbalization, and compelling circumstances to the contrary, the defendant must not be deprived of the oral word.

In this case, live testimony was especially important since the credibility of these defense witnesses was directly at issue: The government and the defense witnesses gave sharply conflicting versions of the government's role in the offenses. Finally, the stipulation itself was so poorly worded that it undoubtedly confused the jury.[5] We cannot be perfect in balancing the scales of justice, but if we are left with any doubt as to which direction they have tilted, we must be certain they are not weighted against the defendant. We must be certain that the avoirdupois is not on the defendant's side. In this case, we might guess, we might hypothesize, we might surmise, but we could not conclude beyond a reasonable doubt that the defendant was not prejudiced by the due process violation.

Because the government violated the defendant's due process right to present his witnesses, we reverse the judgment of the district court. However, at a new trial the defendant should be able to obtain the live testimony of the two defenses witnesses. Accordingly, we reverse the judgment of

---

4. Of course, the parties only stipulated as to what the witnesses would have stated had they taken the stand. They did not stipulate that their testimony was true.

5. The record on appeal states that the following is the stipulation which was read to the jury:

"Mr. Berger: As I understand the situation, there were a number of conversations. Sometime around the end of April, the last week in April, there were conversations between Mr. Crawford and Mr. Parsons in which Mr. Crawford told Mr. Parsons of the new deal, which was the individual who would have credit but who would be filing a petition in bankruptcy, and at that time Mr. Parsons told Mr. Crawford, 'I don't want any part of that deal, leave me out of that completely,' and Crawford said, you know, he or he and Duradio were going to sell that deal and that was the only deal they were going to sell to Hammond and they were going to push Hammond on the deal. That's the way they want it done and that's the way it's going to be.

"That Hammond was not willing to do the deal that way but they were going to push it.

"Thereafter, the next time he spoke to him was perhaps the first week in June, at which time Crawford told Parsons that the deal was done that way; that they had done it intentionally to set him up; that they wanted to set him up; that they induced him to go into the deal because they were getting even and they were getting even because of a prior deal, which he didn't even know about, had come down.

"The Court: Who was 'he'?

"Mr. Berger: Mr. Parsons. Mr. Parsons did not know it had come down, had been completed, and that Hammond had not given Crawford all of the money or any of the money he was supposed to get. Because he didn't get the money, that's why the deal was set up with the individual who was supposed to go into bankruptcy and damage the brokerage firm and that, in effect, is why they worked on seelling that deal to Hammond."

This "stipulation" is actually a transcript of part of the testimony taken in the judge's chambers after the incident between agent Peisner and defense witness Parsons.

the district court and remand the case for a new trial.[6]

REVERSED and REMANDED.

VANCE, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I and II and most of part III of the majority opinion, but dissent as to reversal of Hammond's conviction.

The government's unquestionably improper conduct would have entitled Hammond to a mistrial if he had desired one. He did not. In fact, he objected to mistrial and proceeded on the basis of a stipulation. As a matter of defense strategy Hammond gambled and lost.

Hammond does not now argue that he is entitled to a new trial. He urges only that the government's misconduct was so egregious that the district court erred by not dismissing the indictment. That contention is correctly rejected by the majority.

Under these particular circumstances, rather than grant Hammond the new trial to which he objected, I would affirm.

---

**6.** The defendant also argued on appeal that the government's involvement in these offenses was so outrageous that, under the principles enunciated in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), it should bar his conviction. In *Hampton*, five justices left open the possibility that a court could, on due process grounds or under its supervisory powers, bar the conviction of a predisposed defendant because of the outrageous conduct of the police. The defendant in this case, however, has not proved that the government's involvement in these offenses was so outrageous. On this record, the exact role the government played is unclear. At a new trial the defendant will be able to call his defense witnesses and they can testify to the government's participation. In this way the defendant will be able to develop fully his *Hampton* claim.