**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arthur Thomas NIXON, David L. Snoddy and Donald E. Gilbreth, Defendant-Appellants.**

No. 84–3721.

United States Court of Appeals, Fifth Circuit.

Dec. 2, 1985.

Robert F. Barnard, Asst. Fed. Public Defender, New Orleans, La., for Nixon.

Michael S. Fawer, Salvador G. Longoria, New Orleans, La., for Snoddy & Gilbreth.

John P. Volz, U.S. Atty., Peter G. Strasser, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before POLITZ, GARZA, and HILL, Circuit Judges:

GARZA, Circuit Judge:

Defendants were convicted of various counts involving the attempted purchase, possession, and distribution of over 40,000 pounds of marijuana. They appeal their convictions on several grounds, namely:

(1) that the government's conduct leading to the attempted purchase of marijuana was sufficiently outrageous to warrant dismissal of the indictment as a matter of law;

(2) that the district court erred in admitting certain hearsay testimony relating to defendants' predisposition to criminal conduct;

(3) that the district court's defective jury instruction on the issue of entrapment requires reversal as a matter of law;

(4) that the district court erred in denying defendants pretrial access to the government's confidential informants and certain other records;

(5) that several instances of prosecutorial misconduct invalidated the legality of the proceedings and denied defendants a fair trial, and

(6) that the district court erred in permitting the jury to view an allegedly inaudible audiovisual tape.

For the reasons which follow, we affirm the conviction.

FACTS

This case began as a reverse sting operation whereby Drug Enforcement Agency ("DEA") agents posed as sellers, rather than as buyers, of a controlled substance. Although the defendant-appellants' version of the facts differs markedly from that of the government, we will set out the facts as objectively as possible.

David Paige (alias David Cohen), a DEA agent posing as a drug dealer, used three confidential informants; James McMillan, Donald Smith, and James Marshall, to garner information about illicit drug dealing activity by the three defendants; Donald Gilbreth, David Snoddy, and Arthur Tommy Nixon.[1] Although the confidential informants ("CIs") apparently thought of themselves as "special federal agents", it seems that these three men were more at home with other criminals than with drug enforcement personnel. Their need for money is what motivated them to help "make cases" for the government. In other respects, the three CIs appeared to be as lawless as any con man or drug dealer.

Defendants Gilbreth and Snoddy were introduced to Donald Smith and James McMillan, two of the CIs, in the late summer of 1983 in Meridian, Mississippi. Without the government's knowledge, Smith and McMillan originally intended to con Gilbreth and Snoddy, but decided that this would be too dangerous. Instead, the CIs led the defendants to DEA agents posing as big-time drug smugglers.

The initial meeting between the defendants and the undercover agents occurred on October 26, 1983, in New Orleans, Louisiana. According to the defendants, the purpose of this meeting was merely to try to sell the agents some real estate in Florida. Instead, the agents offered to sell the defendants a large quantity of marijuana and tried to close a deal. The defendants say they merely listened to the sales pitch but did not show any interest in the deal. The government claims that the defendants were very interested in making a drug deal and that they offered several of their real estate holdings as consideration for the transaction. No final agreement was reached at this time and the men each went their separate ways.

The next meeting between the defendants and the agents took place on November 12, 1983, in Jackson, Mississippi.[2] It is not clear whether this meeting was contemplated at the October 26th meeting in New Orleans or whether it was set up subsequently by either side. In any event, one of the CIs had informed Agent Paige that

---

**1.** Two other defendants; William Max Rhodes and Samuel Burchard, were also indicted. These two men played lesser roles in this drama and both were acquitted.

**2.** Gilbreth was not at this meeting.

the defendants were interested in making a deal for only 20,000 pounds of marijuana rather than the 140,000 pounds originally offered to them at the October 26th meeting in New Orleans. When defendant Nixon counterproposed a smaller deal, Agent Paige acted surprised and upset. The men happened to be riding in a car at the time, and Paige demanded that the car be stopped in a nearby parking lot. Paige heatedly told defendant Snoddy that he had expected to go through with a deal for 140,000 pounds of marijuana. Now he would be left holding 120,000 pounds of weed, risking exposure to law enforcement officials, and the displeasure of his boss, George. The defendants contend that Paige's temper tantrum, coupled with insinuations of possible violence to the defendants by George and his cohorts, was a central factor in motivating them to negotiate with Paige. Paige, however, contends that his temper tantrum in the parking lot was simply an exhibition consistent with his undercover role as a big-time drug smuggler. Paige testified that any mention of possible violence because of this new development was strictly in regard to violence to himself by George, his boss. The defendants were not threatened or intimidated.

On November 16, 1983, defendant Snoddy and Agent Paige again discussed the marijuana deal. The defendants were apparently having difficulty obtaining cash with which to buy the 140,000 pounds of marijuana but they remained interested in buying a smaller amount. Paige informed Snoddy that 100,000 pounds of the marijuana had been sold to someone else and that 42,000 pounds remained.

Paige and another agent, posing as a lieutenant of George, met with defendants Snoddy, Gilbreth, and Nixon on November 21, 1983, in Hammond, Louisiana, to further discuss the transaction. Several arrangements were made that day. The down payment for the 42,000 pounds of marijuana was set at $200,000 but the condominiums in Destin, Florida would be part of the deal. The five men flew to Destin, Florida in Snoddy's airplane to inspect the properties.

Defendants Snoddy, Gilbreth, and Nixon had also indicated that they wanted to see the marijuana before buying it. The DEA had recently seized a boatload of Colombian marijuana and the appropriate quantity was placed on a farm outside of Hammond, Louisiana for display to the defendants. After inspecting the weed, defendants Snoddy and Gilbreth signed a document transferring ownership of the condominiums in Destin, Florida to Agent Paige. Defendant Nixon was responsible for sending an eighteen-wheel tractor trailer to pick up the marijuana and transport it to a farm in Corinth, Mississippi for safekeeping. The parties agreed that one of Paige's associates would stay at the farm in Corinth to protect Paige's investment.

On November 27, 1983, defendant Nixon called Paige to inform him that he was only able to obtain $100,000 rather than $200,000 cash to pay for the marijuana. Paige acted disappointed but told Nixon to come to the farm in Hammond, Louisiana, anyway and that possibly something could be worked out. Upon his arrival at Hammond, Louisiana, Nixon told Agents Paige and Ruggerio that two truck drivers and a truck were waiting nearby at the Hammond Holiday Inn to load the marijuana. The number of the room the drivers were in would be etched in the dirt on the truck door. When he was arrested, Nixon was carrying $50,000 cash and the deeds to two farms he owned in Alabama and Tennessee. Agent Ruggerio proceeded to the Holiday Inn where he found the truck described by Nixon. The truck drivers were arrested as they left their hotel room to go to the farm. Defendants Snoddy and Gilbreth, who were not present in Hammond, Louisiana, at the time, were arrested later.

On January 27, 1984, a sixteen-count superseding indictment was returned against defendants Snoddy, Gilbreth, Nixon, Burchard, and Rhodes. The defendants were charged with conspiring to commit an offense against the United States, 18 U.S.C. § 371; traveling in interstate commerce in

aid of an unlawful enterprise, 18 U.S.C. § 1952; aiding a principal in the commission of an offense, 18 U.S.C. § 2; attempted possession of a controlled substance, 21 U.S.C. § 846; and using a communication facility in the commission of a felony, 21 U.S.C. § 843(b).[3]

Defendants filed a pretrial motion to dismiss the indictment on grounds of governmental overreaching. A pretrial hearing on the motion was held but the district judge opted to reserve her ruling until after hearing further evidence during the course of the trial. On the 13th day of trial, after all except the rebuttal evidence was in, the district court ruled against defendants on their motion to dismiss because of government overreaching. The court found that neither the conduct of the government agents nor that of the confidential informants was sufficiently outrageous to have violated defendants' due process rights. The defendants contend that this was error and point to the lawless character of the confidential informants as well as the coercive tactics of the government agents in prodding the defendants into a drug deal that they supposedly wanted no part of. Distasteful as the tactics of the DEA agents may seem, our decision is governed by certain legal standards peculiar to appellate review.

## I. *Government Overreaching or Entrapment?*

### A. *Government Overreaching.*

Among their numerous contentions, the defendants urge two related but distinct defenses. These are based on the concept of entrapment which has been fleshed out in several United States Supreme Court and federal circuit court cases. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *United States v. Gray*, 626 F.2d 494 (5th Cir.1980), *cert. denied*, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981); *United States v. Graves*, 556 F.2d 1319 (5th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978). In his pretrial motion to dismiss, defense counsel advanced the argument that outrageous governmental misconduct in the enforcement of the criminal laws invalidated an indictment that results from such an investigation regardless of the defendant's predisposition to commit the crime. The district court reserved its ruling on this motion until hearing further evidence during the trial itself that might be probative on the issue of government overreaching. On the thirteenth day of trial, the district court denied defendant's motion to dismiss for government overreaching.

■■■ Although a ruling of this type is a matter of law to be decided by the district court, it must necessarily be based on factual findings made by the judge trying the case. This presents a question of mixed law and fact. After reviewing the record evidence we cannot say that the factual basis of the district court's ruling was clearly erroneous nor do we find government overreaching as a matter of law.[4] While the government's conduct might shock some sensibilities, we must evaluate

---

**3.** The original indictment contained only eleven counts. The superceding indictment added charges against Snoddy and Nixon for use of the telephone in the attempted possession of marijuana. 21 U.S.C. § 843(b).

**4.** In *Hampton v. United States, supra,* the plurality held that the defense of government overreaching as a matter of law was precluded if the predisposition of the defendant to commit the crime was established. Justice Rehnquist stated for the plurality, "[t]he limitations of the Due Process Clause of the Fifth Amendment come

into play only when the government activity in question violates some protected right of the *defendant."* 425 U.S. at 490, 96 S.Ct. at 1650 (emphasis in original). In a concurring opinion, however, Justice Powell disagreed with the plurality's reliance on language from *Russell, supra,* to foreclose the court's supervisory power to bar conviction of a predisposed defendant because of outrageous police conduct. *Id.* at 493, 96 S.Ct. at 1651. Under our facts, we need not address this issue.

it in light of the undercover activity necessary to the enforcement of the criminal laws. Under these circumstances, we do not find the government's conduct sufficiently outrageous to warrant dismissal of the indictment as a matter of law.[5]

### B. *Entrapment.*

Although defendants contend that the jury charge on entrapment was defective, we note that the jury did not find for defendants on the issue of entrapment.

Defendants level two arguments against the jury finding of no entrapment. First, defendants contend that the district court erroneously allowed hearsay statements relating to the defendants' predisposition to criminal activity into evidence. The second, briefly mentioned previously, concerns a defective jury instruction on entrapment. We will address the hearsay complaint first.

### 1. Hearsay Regarding Predisposition.

During his examination, Agent Paige made several non-elicited responses regarding prior unlawful acts of one or more of the defendants. Once, Paige testified that he had viewed a photograph of defendant Nixon in a DEA file, and he alluded to other investigations by the DEA concerning defendant Burchard. The district judge instructed the witness to limit his answers to the questions asked. But Paige

also testified about statements by defendant Nixon that elaborated on prior drug smuggling and drug transporting ventures of the defendants. The district court overruled the objections to this testimony.

Defendants rely on *United States v. Webster*, 649 F.2d 346 (5th Cir.1981) (en banc), which prohibited the practice of allowing gross hearsay statements into evidence to prove defendants' predisposition because this practice resulted, "in the very evils that the rule against hearsay was designed to prevent" and that it was difficult to envision, "a situation where the disparity between the probative value and prejudicial effect of evidence is greater." 649 F.2d at 350 (footnotes omitted).

■ However, *Webster* should not be read as broadly as defendants would like. *Webster* does not prohibit the use of hearsay evidence per se. It held that, "hearsay evidence is only admissible in an entrapment case under the *usual rules* relating to hearsay, so that hearsay may not be introduced as evidence of predisposition." 649 F.2d at 347 (emphasis added). Defendant Nixon's statements to Agent Paige about prior drug smuggling activities fall under the rule of admissions by a party opponent, which are deemed non-hearsay. Fed.R.Evid. 801(d)(2). Moreover, even though *Webster* placed limits on the type of evidence that can be used to prove predis-

---

5. Throughout the trial defense counsel persistently placed into evidence both the illegal and immoral misdeeds of the government agents and the informants. The confusion attendant to the distinction between the related but distinct concepts of government overreaching and entrapment probably contributed to the length of this trial, as the following colloquy between the court and the parties shows:

> COURT: What we are interested in here, on this trial, is not Government overreaching. We, here, during the course of the trial, will be hearing any type of evidence that you can present as to entrapment, which is an entirely different ball game.
> DEFENSE: It's not entirely different.
> COURT: Oh, yes, it is. And this is something that I can see we are going to have a lot of fun tomorrow in this case.
> DEFENSE: The only difference between—the only basic difference between the two, it was

a situation that the predisposition of a defendant makes not one bit of difference in an overreaching situation, and the test I have, that's the only real difference, is to look at it and analyze it through. I can have on my hands Hitler and if the Government overreached, the case gets thrown out.
> COURT: Let me just—
> DEFENSE: But the point is an entrapment case, they can come back with predisposition.
> COURT: As a matter of fact, isn't that what the whole thing is all about.
> DEFENSE: What?
> COURT: In entrapment.
> DEFENSE: I'm sorry, what—
> COURT: Is predisposition.
> DEFENSE: Well, first, we got entrapment, then comes predisposition. You can't have—
> GOVERNMENT: No, no, no. As long as we're going to discuss this—

18 Record at 171–72.

position, a defendant who asserts entrapment as a defense exposes himself to a "searching inquiry into his own conduct and predisposition.... *Sorrells,* 287 U.S. at 451, 53 S.Ct. at 216; *United States v. Dickens,* 524 F.2d 441, 444 (5th Cir.1975), *cert. denied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). It may have been error for Agent Paige to make references about his familiarity with some of the defendants through other DEA files and investigations, but we find that the trial judge, upon objection by defense counsel, adequately cautioned the witness. The prejudicial effect, if any, would not have justified a mistrial and does not, on appeal, amount to reversible error.

### 2. The Jury Charge.

■ When a defendant raises the defense of entrapment, he must present a prima facie case "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *Pierce v. United States,* 414 F.2d 163, 168 (5th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969). It then becomes the government's burden to prove beyond a reasonable doubt that the defendant was predisposed to commit the charged offense. *Id.* The defendants were allowed to submit to the jury the issue of entrap-

ment. They claim, however, that the charge was fatally defective.

Defendants contend that case law requires a charge to tell the jury two things: what the quantum of proof required is and that the government bears the burden of proof.[6] Further, they argue that this Circuit follows a per se rule of reversible error if one or both of these elements is missing from the jury charge. We disagree.

Although defendants correctly note that the charge on entrapment does not specifically tell the jury that the burden of proof falls on the government, it avoids the error that was at issue in *Notaro v. United States,* 363 F.2d 169 (9th Cir.1966) and *United States v. Wolffs,* 594 F.2d 77 (5th Cir.1979), on which defendants rely.

In *Notaro,* the Ninth Circuit approved the first paragraph of the charge on entrapment, which is almost identical to the first paragraph in this case, but disapproved of the second paragraph for several reasons.[7] The court found it reasonably probable that the wording of the charge confused the jurors about which party carried the burden of proof on this defensive issue. It also found that by the wording of the instruction the jury was not permitted to acquit the accused unless it "should find from the evidence" that the necessary elements of the defense existed. 363 F.2d at

---

6. The jury charge read:

 If, then, the jury should find *beyond a reasonable doubt* from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, a defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that Government officers or their agents did no more than offer the opportunity, then the jury should find that the Defendant is not a victim of entrapment.

 On the other hand, if the evidence in the case should leave you with a *reasonable doubt* whether the Defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the Government, then it is your duty to find him not guilty. (emphasis added).

7. The challenged instructions in *Notaro* read, in pertinent part:

"If, then, the jury should find *beyond a reasonable doubt* from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the accused was ready and willing to commit crimes such as charged in the indictment, whenever opportunity was offered and that the Government agents did no more than offer the opportunity, the accused is not entitled to the defense of unlawful entrapment.

*"On the other hand, if the jury should find from the evidence in the case that the accused had no previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some agent of the Government, then the defense of unlawful entrapment is a good defense and a jury should acquit the defendant."*

*Notaro,* 363 F.2d at 173 (emphasis added by the *Notaro* court, footnote omitted).

176. This imposed a heavier burden on the accused than was allowable because he was entitled to be acquitted if from the evidence the jury retained a reasonable doubt that the elements of the defense of entrapment had been excluded. *Id.* Thus, despite the court's obligation to evaluate the instructions in their entirety, it was compelled to hold that charge fatally defective, notwithstanding that the general instructions properly placed the burden of proof on the government. *Notaro,* 363 F.2d at 175–76.

*Wolffs* adopted the rule of *Notaro* on this issue, 594 F.2d at 82, and found the instruction in *Wolffs,* which was even more egregious than the one in *Notaro,* fatally defective also.[8] The instruction in *Wolffs* made absolutely no mention of the quantum of proof required (beyond a reasonable doubt) or upon which party the burden of proof fell. Yet the court in *Wolffs* did not stop after finding the instruction defective; it went on to make the statement that the instruction must apprise the jury that the burden is on the government,[9] even though the *Notaro* instruction did not contain such a statement.[10] This statement occurs after the court finds the instruction defective based on *Notaro;* therefore, the statement is dicta because it was not necessary to the decision. While the instruction given in this case does not comply with the dicta in *Wolffs,* the instruction does cure the defect that concerned the court in *Notaro.*

■ Moreover, the general rule in this Circuit regarding the adequacy of jury instructions requires us to view the court's charge as a whole and determine whether it clearly instructs the jurors as to the principles of laws which they are to apply in deciding the factual issues before them. *United States v. Cronin,* 717 F.2d 164, 170 (5th Cir.1983), *cert denied,* — U.S. —, 104 S.Ct. 3586, 82 L.Ed.2d 884 (1984). We find that the charge as given, unmistakingly apprises the jury of both the quantum of proof and upon whom the burden falls. The charge does not ramble or appear confused, and references to the reasonable doubt standard in the entrapment portion of the charge make it obvious who had the burden of proof.[11] Also, the court's gener-

---

**8.** The challenged instructions in *Wolffs* read, in pertinent part:

> So, if you as the Jurors, having heard the evidence in the case, conclude that before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit crimes such as those charged in the indictment when a favorable opportunity was offered and the Government merely offered him the opportunity, then the defendant is not entitled to the defense of unlawful entrapment. If, on the other hand, you find that the defendant had no previous intent or purpose to commit any offense of the character charged and did so only because he was induced, or persuaded by some Agent of the Government, then the prosecution would have seduced an innocent person and the defense of entrapment would be a good defense, and of course, in that event the defendant should be acquitted.

**9.** Defendants rely on language from *Wolffs,* which reads:

> The language of an entrapment instruction must unmistakably apprise the jury *that the burden is upon the government* to prove beyond a reasonable doubt that, before anything at all occurred respecting the alleged offense for which the defendant is being prosecuted, the defendant was ready and willing to com-

mit such crimes whenever an opportunity was afforded, and that government agents did no more than offer the opportunity. The instruction also must be unmistakably clear in informing the jury that if the evidence in the case leaves a reasonable doubt as to whether defendant had the predisposition to commit an offense of the character charged, apart from the government inducement or persuasion, the defendant must be found not guilty. 594 F.2d at 83 (emphasis supplied in defendants' brief).

**10.** See *supra* note 8.

**11.** The court's charge on entrapment provided in its entirety:

> These three defendants, Mr. Snoddy, Gilbreth, and Nixon assert that they were victims of entrapment as to the offenses charged in the indictment.
>
> Where a person has no previous intent or purpose to violate the law, but is induced or persuaded or pressured by law enforcement officers or their agents to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.
>
> On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that Government agents

al charge, which admonishes the jury several times that the government has the burden to prove guilt beyond a reasonable doubt, cures any deficiency that the instruction on entrapment may contain.

## II. Pretrial Access to Government Information

### A. The Confidential Informants

Defendants also complain about the district court's failure to grant them pretrial access to the CIs involved in making this arrest. Defendants claim that a pretrial interview with the CIs would have helped them prove their defenses of government overreaching and entrapment. We have no problem in dismissing this complaint.

■ The United States Supreme Court addressed the government's obligation to disclose the identity and whereabouts of government informers in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d (1957). *Roviaro* recognized that "no fixed rule with respect to disclosure is justifiable" and that "[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defenses." 353 U.S. at 62, 77 S.Ct. 628. Two principal factors in striking the balance are the degree of participation exercised by the informant, *United States v. Alonzo*, 571 F.2d 1384 (5th Cir.1978), *cert.*

*denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978); *Alvarez v. United States*, 525 F.2d 980 (5th Cir.), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 820 (1976), and the probative value of the informant's probable testimony in relation to the defendant's defense. *United States v. Davis*, 487 F.2d 1249, 1251 (5th Cir.1973); *United States v. Acosta*, 411 F.2d 627, 630 (5th Cir.1969). At an ancillary hearing before a magistrate, the court found that the informants were not active participants in the transactions in question and denied defendants' motion for disclosure of the informants' identities and whereabouts.

■ Nonetheless, after much prodding by defense counsel, the government disclosed the identities of the informants and produced the two principal informants at trial, where they testified as defense witnesses. The record does not reveal whether the whereabouts of the informants had been disclosed before trial. In its appellate brief, the government asserts that the informants were made available to defense counsel for a pretrial interview but that the informants chose not to speak with counsel for defendants.[12]

■ In *United States v. Fischel*, 686 F.2d 1082 (5th Cir.1982) we held that the government must have some valid reason for withholding an informant's address when the informant may have information

---

provide what appears to be a favorable opportunity is not entrapment. For example, it is not entrapment for a Government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction.

Therefore, entrapment is shown where it appears that a law enforcement officer or someone acting under his control or direction instigates the defendant to commit an offense, or reinitiates an offer to participate in a crime which the defendant previously turned down, and which the defendant otherwise would not have committed and had no intention of committing. It is not entrapment, however, if the defendant already had the requisite criminal intent, and the officer, or someone acting for him, merely furnished the defendant with the opportunity to commit the offense.

If then, the jury should find *beyond a reasonable doubt* from the evidence in the case that, before anything at all occurred respect-

ing the alleged offenses involved in this case, a defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that Government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case *should leave you with a reasonable doubt* whether a defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the Government, then it is your duty to find him not guilty.

14 Record at 245–46 (emphasis added).

**12.** We note that the informants cannot be compelled to a pretrial interview with defense counsel. *United States v. Opager*, 589 F.2d 799, 804 n. 11 (5th Cir.1979).

pertinent to the defendant's theory of defense. *Id.* at 1092–93. The government in this action opposed such disclosure on the ground that the informants were not "actively involved" in the transactions in question.[13] While the accuracy of this finding is dubious in light of the consistent presence of the informants at all the significant meetings between the DEA agents and the defendants, we do not find any prejudicial error in the defendants' failure to get a pretrial interview with the informants.[14] The defendants placed not only the two principal informants on the witness stand but the ex-girlfriend of one of the informants and her roommate as well, who were both privy to much of the informants' activities. Even assuming, however, that the defendants were wrongfully denied pretrial access to the informants, our review of their testimony convinces us that there was no information that the CI's could have revealed to the defendants that would have helped them make a showing of government overreaching or entrapment.

### B. *The DEA Files on the Informants*

Along with their request for access to the confidential informants, the defendants also requested to inspect certain files maintained by the DEA on its confidential informants. We agree with the government's contention that defendants were attempting to use the subpoena duces

---

13. In fairness to the defendants, the government was unable to give a good reason why the confidential informants should not be produced. The following exchange took place during the hearing on defendants' motion to dismiss because of government overreaching:

DEFENSE: I would like to see them [the informants] here for the purposes of this hearing because we've raised a very substantial overreaching case, and why I say that, Judge, look at the case, one of the things that's germane, if you hold out a pot that the inducement is so great, in effect, what the law is, that even Christ, will all due respect, would succumb to a certain amount of money, and that it's part of human frailty to give in to that. They're holding out a potential of millions to the defendant....

. . . . .

COURT: I think you've made your point here. Does anybody wish to respond?
GOVERNMENT: No, ma'am.
COURT: Well, let me say this, I will agree with [defense counsel] that there has been nothing said by the Government as to why these informants should not appear at the trial.
GOVERNMENT: Your Honor, it's the Government's position that these informants are very much afraid of those defendants and that we don't want them here because those defendants are on bond right now. We have them here in the Courthouse, then the informants are placed in jeopardy. That's the Government's position.

. . . . .

COURT: Well, who is to say that—well, that sounds weak to me, Ms. Homberg. I need something more than that.
9 Record at 311–13.

14. It also appears from the record that defense counsel was satisfied with calling the informants to the stand and foregoing a pretrial interview. At the hearing on the motion to dismiss defense counsel stated:

And the final thing, Your Honor, just so we understand the parameters of what I'm asking for, I would, once again, based on this entire record as we have it at this point, ask that these confidential informants, whose names we have, that we be given access to them so that we can serve them with subpoenas. *I'm not interested in interviewing them.* I want to put them right on the stand. I want to put them on the stand for the purpose of the overreaching motion and I want to use the power of compulsory process available to the defendant to put them on the stand in the course of the trial itself.
9 Record at 302–93 (emphasis added).

. . . . .

We're really here in an overreaching case and in the course of doing so have concomitantly raised the defense of—raised the fact that they clearly have a legitimate entrapment defense and I want to prove it from the lips of the people who did the entrapping, and he's telling me I can't put on the witnesses that I say did it.

I have the right. I always thought in this Court I have the right to subpoena who I say is relevant, and I say those three witnesses, those three informants whose names I know—and by the way, Judge, no one has yet given me one centilla [sic] of reason of why they should not be brought in. There's no jeopardy issue because we know their names. *I'll never ask where they live because I don't care where they live.* I just want to see them sitting behind that microphone and want the process of the United States to get them here and I want the Court to insist, with all due respect, that they be made available for the defense of criminal—for the criminal defendants in this Courtroom, and that's all I want.
9 Record at 311 (emphasis added).

tecum as a discovery device, which it is not. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220, 71 S.Ct. 675, 95 L.Ed. 879 (1951); Fed.R.Crim.P. 17(c). Under the plain language of Rule 16(a) the defendants were not entitled to:

> [T]he discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500.

Fed.R.Crim.P. 16(a)(2). Although the relevancy, much less the probativeness of the DEA files on the informants was at best attenuated, the court agreed to an in camera inspection of these files.[15] Nothing helpful to the defendants turned up.

### III. *Prosecutorial Misconduct*

Defendants attack next three alleged instances of prosecutorial misconduct that prejudiced their defense. First, defendants maintain that the prosecutor lacked a good faith basis for asking three defense character witnesses whether they knew that defendants Snoddy and Gilbreth transported cocaine on a bus owned by them. Second, defendants claim that the prosecution intimidated a witness and pressured him to testify on the government's behalf. Third, defendants contend that the prosecutor made an improper closing argument. We will examine each contention in turn.

### A. *Good Faith Basis*

On the ninth day of trial defendants Gilbreth and Snoddy put on three character witnesses who had business dealings with these two defendants. Two of the witnesses, Scott Ray and William Phipps, bank officers at the Bank of Lexington and the Southern Bank of Lauderdale County respectively, knew defendants Snoddy and Gilbreth because of certain loans taken out by them through each of the banks.[16] The third witness, Roger Pettus, was in the automobile business but also had overlapping business interests with defendants Snoddy and Gilbreth. One of defendant Gilbreth's businesses was the leasing of a customized bus to traveling music stars.[17] The purchase of one particular bus was financed by a purchase money loan from the Bank of Lexington. Scott Ray, an officer of the bank, knew that the bus served as collateral for the loan but he did not know any specifics about the bus. William Phipps and Roger Pettus knew that one of Gilbreth's businesses was the leasing of this bus to music stars but knew little else about it.

On cross-examination of Scott Ray, the prosecuting attorney asked the witness whether he knew if the bus was "used to transport large quantities of cocaine." Defense counsel reacted by questioning the government's good faith basis for suggesting that fact to the jury. The government intimated that it had a basis in fact for asking the question and that it would provide it to the court. Defense counsel did not object when the government asked substantially the same question of Roger Pettus and William Phipps.

At a post-verdict bond hearing for the defendants, the government produced two pictures that had been seized by Alabama law enforcement officers at the home of defendant Snoddy's brother pursuant to a

---

**15.** 18 U.S.C. § 3500(c) provides, in pertinent part:

> (c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera.

**16.** At the time of trial, William Phipps was no longer a bank officer. He was an officer of a real estate development company. He was also associated with defendant Gilbreth in the development of a bowling center.

**17.** Defendants Snoddy and Gilbreth appear to have had a variety of business interests. These ranged from real estate development and townhouse construction to an interest in a bowling center and to the leasing of these "celebrity" busses.

search warrant for marijuana unrelated to the charges made in this case. The pictures depicted several persons inside some kind of vehicle handling what appeared to be cocaine. The court did not rule on this issue at the bond hearing.

This issue was taken up again several months later at a hearing on defendants' motion for new trial. Defense counsel placed the U.S. Attorney on the stand to elicit testimony about her good faith basis for having asked questions about the transportation of cocaine on a bus owned by defendant Gilbreth. At this hearing it developed that the pictures the prosecuting attorney relied on as a good faith basis had apparently been taken before Gilbreth had ever owned the bus. It turned out that the pictures had not been taken inside a bus, rather they apparently had been taken inside a converted railway car located outside the Chattanooga Choo Choo Hilton in Chattanooga, Tennessee and rented out as lodging by the hotel. The U.S. Attorney also testified, however, that she had relied on hearsay statements by certain Alabama police officers familiar with the defendants to the effect that defendant Snoddy had transported cocaine on busses that were leased out to music celebrities.

■■■■ We will not launch into a discourse on the practical and theoretical underpinnings of the law of evidence that allows a prosecuting attorney to probe a defense character witness's familiarity with the defendant by asking questions about purported prior bad acts of the defendant. We note only that the potential for abuse here, by wafting before the jury "did you know?" type questions that have no basis in fact but which can be fatal to the defendant, has led to the imposition of two safeguards that should be complied with before such questions may be asked in the presence of a jury. First, the alleged bad act must have a basis in fact and second, the incidents inquired about must be relevant to the character traits at issue in the trial. *Michelson v. United States*, 335 U.S. 469, 481 n. 18, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948); *United States v. Crippen*, 570 F.2d 535, 538–39 (5th Cir.1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979). That does not mean that the basis in fact must be proved as a fact before a good faith inquiry can be made. *See United States v. Bright*, 588 F.2d 504, 512 (5th Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) (government's proffer of a letter of reprimand for stipulation and its willingness to reopen the case in an attempt to prove fact of defendants' (an attorney) reprimand by a judge and the bar association demonstrated the necessary good faith factual basis for cross-examination of defense character witness, an attorney, regarding defendant's reprimand).

■■■■ The government should have laid a foundation out of the presence of the jury before asking these questions, to give the judge an opportunity to rule on the propriety of asking them. Defense counsel attempts to make much of the fact that the prosecuting attorney erred in her evaluation of the pictures. Nonetheless, after hearing argument and evidence from both parties the district court found that the government had a good faith basis for asking the questions.[18] The court further

---

18. We quote from the record verbatim:
**COURT:** Now, as far as the good faith basis, I feel that based upon what Ms. Homberg has testified to and my recollection of what the testimony was that she had, that it was reasonable for her to find or to believe that these were pictures taken of a bus. *They certainly look like a bus.* The fact that it was some lounge somewhere, nobody brought that out, we didn't know about it until after trial. Based upon what Mr. Brown had told her, certainly—it certainly tied Mr. Snoddy in with that, and based upon what McMillon and some of the other confidential informants testified to, there was every reason for her to believe that the bus in question was Mr.—the pictures in question involved Mr. Gilbreth's bus, or the fact that she may have asked those questions.

But, assuming, however, this case here went on a long time, there was a lot of hot tempers involved and a lot of problems that arose during the course of the trial. I feel that with viewing it, an overall view of all of the testimony presented, I find that there was sufficient evidence for the Jury to conclude as to what they did come up with, and that if these photographs

found that even if the questions based on the photographs should not have been asked, there was sufficient independent evidence of guilt to support the jury verdict and the error, if any, did not have a substantial adverse impact on the jury's verdict.[19] *United States v. Rodriguez,* 524 F.2d 485, 487 (5th Cir.1975), *cert. denied,* 424 U.S. 972, 96 S.Ct. 1474, 47 L.Ed.2d 741 (1976). We see no reason to disturb this finding.

## B. *Government Interference with a Defense Witness*

The second instance of prosecutorial misconduct raised by the defendants involves the alleged intimidation of a defense witness by the government attorney. Albert Neal Aycock was called at the instance of defendant Rhodes. He was a farmer and had a business interest in a company that sold farm equipment. He knew defendants Rhodes and Nixon through his business dealings with them. Aycock testified that at a chance meeting with defendant Nixon, Nixon had asked him if he knew of anyone that could haul some farm equipment he had just bought. Aycock referred Nixon to defendant Rhodes, who lived near where the purported farm equipment was located, and made arrangements for Nixon to meet with Rhodes.

It developed at trial that the government had subpoenaed Aycock in an attempt to have him testify against defendants Rhodes and Nixon.[20] The court conducted a hearing outside the presence of the jury on the government's purported intimidation of Aycock. Counsel for defendants Gilbreth and Snoddy attempted to persuade the court that the government's treatment of Aycock was relevant to and probative of the issues of entrapment and government overreaching. The district court ruled to the contrary and refused to let Aycock's testimony regarding his treatment at the hands of the government to go before the

---

in question should not have been asked, that the error that was made was not so overwhelming as to grant a new trial, did not prejudice the defendants because of the other sufficient evidence that was offered.

17 Record at 65–66 (emphasis added).

**19.** Defense counsel's conspicuous failure to object in no uncertain terms to these questions at the time they were asked, and his vehement argumentation on this point after the verdict came in leads us to conclude that defense counsel either did not believe, at the time the questions were asked, that they were prejudicial or chose to minimize their impact by simply remaining silent. If the former, then we are correct in our view that the defendants were not prejudiced by these questions. If the latter, then defense counsel's tactical decision carried the risk of an adverse jury verdict and a waiver on this point of error. We have reviewed the record closely on this point and are convinced that defense counsel's heavy reliance on this point after receiving an unfavorable verdict was an attempt to "have his cake and eat it too."

**20.** It appears that at one point the government even contemplated arresting Aycock. On the seventh day of trial the following exchange took place between the court and the prosecutor:

COURT: Be seated. Court is now in session. I want to see Ms. Homberg alone.

(Whereupon, the following proceedings were had at the Bench between the Court and Ms. Homberg.)

COURT: I want the record to reflect that my secretary told me that Ms. Homberg is thinking about arresting a witness in this case outside of the Courtroom.

I am putting you on notice that if you cause anything to jeopardize this trial I will hold you in contempt of Court and put you in jail.

GOVERNMENT: No, that's why I wanted to inform you of the problem, because I don't want anything to happen.

COURT: There are other ways and means. The only thing I am telling you is that you are not to jeopardize this trial. We have been in trial a considerable length of time and I want to conclude it and I want that on the record, and you will do whatever you have to do, but you are not an arresting officer.

GOVERNMENT: I know it, that's why I didn't want any arresting officers out there. I wanted to tell you what the problem is.

COURT: All right. That is all I want to put on the record.

GOVERNMENT: I don't know what the—I don't know—I mean, I can't—

COURT: All I am saying, I don't want you to do anything that will jeopardize this trial, period, okay?

GOVERNMENT: I don't know what I'm supposed to do, but, okay.

22 Record at 160–61.

jury.[21] We do not see how the government's purported intimidation of Aycock, a witness called by a defendant who was acquitted, could prejudice the trial of defendants Gilbreth and Snoddy. Defendant Nixon, who stood more to gain by a showing of intimidation of a witness by the government did not even address this issue in his appellate brief.

 Defendants Gilbreth and Snoddy urge that in *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979) this circuit adopted a per se rule of reversal for substantial government interference with a defense witness's free and unhampered choice to testify. *Id.* at 1012–13. We have reviewed the record regarding the treatment of Aycock by the U.S. Attorney's Office and do not find that it constituted a substantial interference with his willingness to testify for the defense.[22] We note, too, that Aycock testified that his treatment by the government had not altered his substantive testimony as a witness for the defense.[23] Consequently, none of the defendants can complain that he was deprived of his Due Process or Sixth Amendment right to present witnesses to establish a defense. *Hammond,* 598 F.2d at 1012 n. 3.

## C. *Improper Closing Argument*

On the last day of trial, government counsel made the following argument to the jury:

> Now, according to Mr. Snoddy and Mr. Gilbreth no one at that meeting [of November 21st in Hammond, Louisiana] discussed their desire to see the marijuana. They didn't want to see the marijuana. Why should they want to see the marijuana, they weren't going to buy it anyway.
>
> Now, [according to the defendants] Mr. Gorman lied to you from the witness stand, that's one DEA agent, he lied to you because he said that they talked about seeing a sample. Mr. Paige lied again and their supervisor, Mr. Cazenavette lied, because he said he agreed to let them see the sample.
>
> Now, of course, in order to see the sample, they had to get permission from the United States Attorney's Office and I don't know what that makes us.

14 Record at 198. At the close of the government's argument, counsel for defendants Gilbreth and Snoddy objected to this portion of the argument on the ground that the prosecution was using the credibility of the United States Attorney's Office to buttress the credibility of the government's witnesses. The district court overruled defense counsel's objection on this point, holding that there was evidence from the witness stand to support the argument.

 We find that the prosecutor did not go outside of the evidence presented in this case in making her closing argument on rebuttal and that these comments were a fair reply to defense counsel's closing arguments. Assuming, *arguendo,* that this statement was unwarranted, such prosecutorial misconduct constitutes a ground for reversal only if the "prosecu-

---

**21.** The court ruled only that it would not allow testimony of Aycock's purported mistreatment by the government to go before the jury on the issue of entrapment. The court did not rule whether the treatment of Aycock was a substantial interference with his decision to testify.

**22.** Direct evidence on the issue of government intimidation of a defense witness was taken during trial, out of the presence of the jury. The government's cross-examination of this witness was concluded several days later at an ancillary hearing before a magistrate. Consequently, we had the benefit of substantial testimony to rule on this issue.

**23.** COURT: Let me ask you this. The testimony that you gave this morning when you were questioned by Mr. Warshauer [counsel for defendant Rhodes], did anything that the Government ever say to you make you change your testimony? I mean, is this the way that you would have testified had they not spoken to you?
WITNESS: Yes, ma'am, I'm telling you the truth about the questions they asked me this morning.
COURT: All right. So, whatever they said to you has not changed your testimony in this courtroom today, has it?
WITNESS: No ma'am. I'm here to tell the truth about it.
23 Record at 138.

tor's argument taken as a whole in the context of the entire case, prejudicially affected substantial rights of the defendant." *United States v. Corona,* 551 F.2d 1386, 1388 (5th Cir.1977). This test was not met here.

### IV. *Inaudible Videotapes*

Defendants' final attack on their conviction is aimed at the use of an audiovisual tape that they contend was erroneously admitted into evidence. This tape was secretly recorded in the hotel room in New Orleans, Louisiana at the October 26, 1983, meeting of the defendants with the undercover DEA agents. Although the probative value of this tape is beyond question, portions of it were unintelligible. The district court listened to portions of the tape to go to the jury. In this circuit, "[t]ape recordings which are only partially intelligible are admissible unless these portions are so substantial as to render the recording as a whole untrustworthy." *United States v. Ruppel,* 666 F.2d 261, 272 (5th Cir.), *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982). We review the district court's decision to admit the recording under an abuse of discretion standard. *United States v. Clements,* 484 F.2d 928, 930 (5th Cir.1973), *cert. denied,* 415 U.S. 991, 94 S.Ct. 1591, 39 L.Ed.2d 888 (1974). We have viewed the tape and find that the district court did not abuse its discretion in allowing the jury to view the tape.[24]

### CONCLUSION

Even from a cold (albeit voluminous) record, we can appreciate the grueling nature of this long, arduous trial on all of the participants. It does not surprise us that at times patience was short, tempers flared, and counsel for both sides made comments or engaged in behavior short of the professional ideal we, as attorneys, are constantly reminded to attain. We have studied the appellants' points of error closely and reviewed the record carefully, and find no reversible error. The convictions of the defendants are affirmed.

AFFIRMED.

---

**24.** The jury did not view the tape in its entirety. Only certain portions of it were shown to the jury at trial. During its deliberations, the jury requested to see the videotape again. The court had a second copy of the tape made, which included only those splices that the jury had been shown during trial, and the jury was allowed to view this edited version of the tape during its deliberations.