**Daniel Neal HELLER, Plaintiff,**

v.

**Lawrence S. PLAVE, Doreen H. Kaplan and Thomas A. Lopez, Defendants.**

No. 89–0639–CIV.

United States District Court, S.D. Florida.

July 18, 1990.

Gilbert Haddad, Coral Gables, Fla., Joseph C. Brock and Lisa Heller Green, Miami, Fla., for plaintiff.

Robert Senior, Asst. U.S. Atty., Miami, Fla., Jose F. DeLeon, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM ORDER

SCOTT, District Judge.

This is a *Bivens*[1] action filed by Plaintiff Daniel Neal Heller ("HELLER") against three employees of the Internal Revenue Service ("IRS") for interference with a defense witness and the use of known false testimony. The Defendants, Lawrence S. Plave ("PLAVE"), Doreen H. Kaplan ("KAPLAN") and Thomas A. Lopez ("LO-

PEZ"), have moved for summary judgment. They assert six defenses: absolute immunity, qualified immunity, res judicata, statute of limitations, judicial estoppel, and election of remedies.

## I. FACTUAL BACKGROUND

Heller is an attorney in private practice. In October, 1977, the IRS began a civil audit of Heller's income tax return for the year ending December 31, 1976. A computer formula had identified Heller's tax return as having a high potential for error. The IRS assigned Revenue Agent Kaplan to undertake, what began as, a routine investigation of Heller's return.

On May 1, 1979, after seventeen months of investigation, Kaplan found evidence of fraud in the pattern of Heller's returns and referred the case to the Criminal Investigation Division (CID) of the IRS for further investigation. This referral involved the services of all three Defendants: Kaplan sent the Heller file to Lopez, a Group Manager in CID; Lopez then turned the report over to Special Agent Plave, who took over the Heller investigation.[2] Based upon Plave's investigation, the IRS recommended that criminal charges be brought against Heller for his tax returns covering the years 1975, 1976, and 1977. The deficiencies in these returns included omissions of legal fees of $178,326.80, $71,914.53 and $187,696.15, respectively.

Eventually, the IRS brought Heller to trial for tax evasion. Heller defended by asserting his reliance on the expertise of his accountant, Leonard I. Safra ("SAFRA"), in preparing his returns from 1972 through 1978.[3] Safra is a certified public

---

1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotic,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. The events surrounding the referral are in dispute. On the one hand, the Defendants claim that on April 19, 1979, Kaplan "quickly" referred Heller to CID when Heller's accountant, Leonard I. Safra, told her that Heller filed his 1978 income tax return picking up over one million dollars of previously unreported income. On the other hand, Heller asserts that the referral was precipitated when Lopez received news of the Heller audit from Kaplan, and then consulted with Kaplan's supervisor, Group Manager J.D. Long, on April 26, 1979, regarding the status of the Heller audit. Heller asserts that Lopez accepted the referral for

criminal investigation because of a personal vendetta against Heller (See infra, footnote 6). In essence, Heller claims that had Lopez shown objective professional judgment, he would not have pursed the criminal investigation.

The referral is not directly pertinent here because this is not a malicious prosection action. However, the genesis of this *Bivens* action is rooted in these same allegations of a personal vendetta.

3. If a taxpayer can establish that she relied on the advice and approval of her tax preparer—the so-called "reliance defense"—she will not be convicted of tax evasion. *See e.g., Bursten v. United States,* 395 F.2d 976, 981–982 (5th Cir. 1968), *cert. denied,* 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972).

accountant and former IRS employee who specializes in providing accounting services for lawyers. Safra and his firm handled all of the accounting work for Heller's legal practice. Safra, however, was not a defense witness at Heller's tax evasion trial. Rather, he became a key IRS witness by testifying against Heller. There is no question that Safra perjured himself at Heller's trials.[4]

This lawsuit arises from the alleged conduct of the defendant IRS agents that encouraged Safra to provide false testimony. Heller claims that the agents induced Safra to testify falsely by threatening him with criminal prosecution. Then, they knowingly allowed Safra to commit perjury at Heller's criminal trials.[5] Heller asserts that the defendants were motivated by a personal vendetta against him arising from his role in exposing alleged IRS misconduct.[6]

The facts, and inferences therefrom, are in dispute. On July 3, 1979, Plave, Kaplan and Lopez met to discuss the Joint Investigation (civil—criminal) of Heller.[7] It is undisputed that the defendants agreed at this meeting to "preclude" Heller's use of a "false" reliance defense. Then, on July 13, 1979, Lopez and Plave visited Safra at his office.[8] The agents did not take notes at this meeting. It is undisputed that Plave and Lopez advised Safra at this time that he could be a defendant in a criminal case for aiding and assisting Heller in evading his taxes. The parties dispute the Defendants' intent in giving this warning. The Defendants contend that they expressed their concern over Safra's role in Heller's affairs; yet, Plave concedes that he intended to scare and intimidate Safra. Heller asserts that the threats of prosecution were intended to induce Safra to testify falsely against him.

Following this initial meeting, events unfolded quickly in the Heller investigation. The very next business day Plave met with Safra's attorney, Charles L. Ruffner ("Ruffner"). At this meeting, Ruffner informed Plave that Safra wanted to be a witness in the Heller case. According to Heller, Plave and Ruffner agreed that Safra would testify that he knew nothing Heller's case-closed method of accounting until after Heller's 1978 return was filed. In return, Plave allegedly promised that Safra would not be prosecuted for aiding Heller. Nine days later, on July 25, 1979, Safra and his firm resigned as Heller's accountants. This action terminated Heller's access to Safra, his co-workers and his records.

**4.** The Eleventh Circuit ruled that Safra perjured himself at Heller's trials. *United States v. Heller*, 830 F.2d 150, 153 (11th Cir.1987). Certain facts lead the Eleventh Circuit to conclude that the District Court was clearly erroneous in accepting Safra's testimony. During the investigation, Kaplan interviewed Safra and made notes of their discussions. Kaplan spent 122 hours on this case, much of that time spent in Safra's office. In at least three meetings, Kaplan's notes show that Safra explained to Kaplan that Heller used a "case-closed method" of reporting income. Using this method, Heller would deposit advance legal fees into a trust account and report the fees as income when he closed the client's case and considered the fee as earned. According to Heller, if Safra knew that Heller conducted his legal accounting in this way, Heller should be entitled to a reliance defense to any charges of tax evasion. Kaplan's notes persuaded the Eleventh Circuit that Safra perjured himself when he said he knew nothing of Heller's case-closed method. This perjured testimony precluded Heller from successfully asserting the reliance defense at his trials.

**5.** Heller makes two allegations in his complaint. Count I alleges that IRS agents interfered with a witness—Safra—using threats and intimidation to induce Safra to change his testimony. Count II alleges that the Defendants deliberately and knowingly elicited false testimony from Safra.

**6.** Agents Lopez and Plave were involved in the IRS' "Operation Leprechaun," in which IRS agents gathered information on prominent Miamians. At that time, Lopez was the supervisor of the "Intelligence Gathering and Retrieval Unit" of the IRS in Miami. Heller was general counsel for the *Miami News* when it uncovered "Operation Leprechaun". The stories appearing in the *Miami News* regarding this operation painted an unflattering picture of the IRS. Subsequently, the IRS Commissioner disbanded the Leprechaun unit and publicly apologized for its activities. According to Heller, it was his role in this incident that biased Lopez and Plave against him.

**7.** A total of six "joint" meetings were held thereafter on the following dates: July 3, 1979; February 6, 1980; March 5, 1980; July 23, 1980; September 24, 1980; and December 19, 1980.

**8.** Defendants claim that they first contacted Safra because he held the power of attorney for Heller with regard to the civil audit.

On August 17, 1979, Plave, Kaplan and Lopez formally interviewed Safra, with Ruffner present, in IRS offices. At that time, Safra stated that Heller concealed this information from him until March, 1979. No one brought forth the official notes of Kaplan's earlier interviews with Safra in which Safra acknowledged the case-closed method. Heller contends that Plave, Kaplan, and Lopez knew then that Safra had changed his story. Moreover, they understood how this change would preclude Heller from asserting his reliance defense. The Defendants did not disclose Safra's contradictory statements to officials of the IRS or the Justice Department.

On June 15, 1981, Plave and Kaplan submitted their final prosecution report recommending criminal prosecution of Heller. Thereafter, officials of the IRS and the Justice Department approved this recommendation.

## II. PROCEDURAL HISTORY

Two civil suits filed by Heller preceded his criminal trials. The agents utilize these suits as a basis for several affirmative defenses in their summary judgment motion. Initially, on March 6, 1981, Heller filed an accounting malpractice complaint against Safra and his partners in state circuit court. This complaint alleged ten counts.[9] The circuit court stayed this action on May 28, 1981. On January 6, 1989, the action was dismissed with prejudice. The Hellers settled for five (5) million dollars. Then, on June 29, 1982, Heller filed an unlawful disclosure action against Plave.[10] This case was tried in January, 1987, and decided on February 4, 1987. *Heller v. Plave*, 657 F.Supp. 95 (S.D.Fla. 1987). Prior to trial, Heller unilaterally withdrew allegations regarding the personal vendetta that motivated Plave's conduct. No proof of a personal vendetta was offered at trial, although it was raised in opening arguments. Plave was ultimately held liable for thirteen negligent disclo-

sures regarding the status and nature of the criminal investigation against Heller. *Heller v. Plave*, 657 F.Supp at 99. On December 31, 1987, the parties settled this action for $21,816.41 and Plave dismissed his appeal with prejudice.

Heller's criminal ordeal began on June 30, 1982, when the Department of Justice authorized criminal prosecution of Heller and a Grand Jury in the Southern District of Florida returned an indictment against him. Heller was tried on three counts of tax evasion in violation of 26 U.S.C. § 7201 (1983) and three counts of falsely subscribing to an income tax return in violation of 26 U.S.C. § 7206(1) (1983). A jury trial commenced on August 25, 1983. On November 10, 1983, following a twelve-week trial, the jury convicted Heller on all counts. On March 29, 1985, Heller was sentenced to three years imprisonment, fined thirty thousand dollars ($30,000) (plus costs), and granted bond pending appeal.

On April 7, 1986, the United States Court of Appeals for the Eleventh Circuit reversed Heller's conviction, citing juror bias. *United States v. Heller*, 785 F.2d 1524 (11th Cir.1986). On remand, Heller was convicted once again. Subsequently, the court sentenced Heller to three years imprisonment, and denied bond pending appeal. Commencing on June 2, 1987, Heller served four (4) months in prison.

On September 29, 1987, the Eleventh Circuit reversed Heller's conviction for a second time, ruling that Safra had perjured himself, thereby depriving Heller of a fair trial. Heller was released from prison and granted a new trial. On March 21, 1988, the Eleventh Circuit denied the Government's petition for rehearing and rehearing *en banc*. On April 29, 1988, the district court granted the Government's motion to dismiss the indictment.

Heller brought the present action on March 28, 1989. On June 30, 1989, the

**9.** In Case No. 81–3045, Heller and his wife sought ten million dollars in compensatory damages and twenty million dollars in punitive damages. Their complaint alleged: fraud and deceit; breach of fiduciary duty; willful and wanton misconduct; negligence; breach of express warranty; breach of implied warranty;

professional malpractice; injurious falsehood; interference with prospective business relationships, and defamation.

**10.** This action was brought pursuant to 26 U.S.C. § 6103.

**1560**

Defendants moved to dismiss the complaint or alternatively, for summary judgment. Heller responded on August 18, 1989. With the case in an appropriate juxtaposition, we now proceed to resolve the merits of the summary judgment motion.

## III. LEGAL ANALYSIS

### A. Collateral Estoppel

The Defendants' suggest that *United States v. Heller*, 830 F.2d 150 (11th Cir. 1987) (hereinafter *"Heller I"*) is a "unique decision" which is not binding in this action. Because this assertion is of concern to the Court, we *sua sponte* consider the preclusive effect of the Eleventh Circuit's ruling as it pertains to the parties and issues in this lawsuit.[11] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ In essence, the Defendants suggest that this Court is collaterally estopped from using *Heller I* (offensively) as dispositive of governmental interference with Safra's testimony. Thus, given *Heller I*, in light of the concept of collateral estoppel, the issue now before the Court concerns what questions must be relitigated in this *Bivens* action? To grant preclusive effect to an issue, we must find that:

1. the issue has been actually raised and litigated in the prior proceeding;
2. the issue was a critical and necessary part of the final judgment in the earlier litigation; and
3. the issue is the same in both actions.

*Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 666 (11th Cir.1984) (offensive collateral estoppel); *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir.1982) (offensive collateral estoppel); *see also Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1501 (11th Cir.1984) (defensive collateral estoppel); 1B Moore's Fed.Prac.Proc. § 0.443(1) at 759 (1988).

■ Our first task is to determine the issues "actually litigated" in *Heller I. United States v. Satterfield*, 743 F.2d 827, 838 (11th Cir.1984) (what issues were actually litigated is a factual question). In

resolving this question, the factors we consider are whether there was an "adequate incentive to litigate vigorously" and whether there was a "full and fair hearing" on the issue. *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d at 666 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). The record before the Eleventh Circuit in *Heller I* consisted of two criminal trials that allowed a full and fair opportunity for the United States to present its case against Heller. Safra's testimony in both trials was a key element of the government's case, and there was a strong incentive to fully develop his testimony. Regarding Safra's testimony, the Eleventh Circuit held that "the ... undisputed evidence establishes that the accountant's testimony was false in very important respects, i.e. his knowledge of the case-closed method." *United States v. Heller*, 830 F.2d at 154. Relying on the conflicting testimony of Safra and Kaplan and on Kaplan's notes of her civil audit, the Court concluded that "the evidence described in the text of our opinion is undisputed and permits no other reasonable inferences." *United States v. Heller*, 830 F.2d at 154, n. 5. Given this strong characterization of the evidence, we conclude that the issue of Safra's perjury was "actually litigated" in *Heller I.*

In another clear statement, the Eleventh Circuit concluded that Heller's conviction depended largely on Safra's testimony. In this regard, the Eleventh Circuit stated "the prejudice to Heller is obvious ... the evidence against Heller [at his trial] was far from overwhelming and the error [in allowing Safra to testify falsely] could not be harmless." *United States v. Heller*, 830 F.2d at 154, n. 6. After *Heller I*, Heller was granted a new trial. On remand, the government dismissed Heller's indictment. The government did not appeal *Heller I*, nor did it pursue criminal charges against Heller in the wake of that case. There is no question that the absence of Safra's testimony critically handicapped the government's case. Accordingly, we conclude that Safra's perjury was a

---

11. We provided the parties with an opportunity to comment on the preclusive effect of *Heller I* in our order of April 23, 1990, requesting supplementary memoranda of law.

necessary part of *Heller I. Giglio v. United States*, 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972); *see U.S. v. Satterfield*, 743 F.2d at 838 (citing *Precision Air Parts, Inc., v. Avco Corp.*, 736 F.2d at 1501–1502).

■ In a broader vein, the Eleventh Circuit also held that Heller was "deprived of an important defense witness by substantial interference on the part of the government." *United States v. Heller* 830 F.2d at 154. Other cases have relied upon the governmental interference finding of *Heller I. See e.g., U.S. v. Sokoloff*, 696 F.Supp 1451, 1460 (S.D.Fla.1988); *U.S. v. Accetturo*, 858 F.2d 679, 681, n. 2 (11th Cir.1988). However, the Eleventh Circuit found that "other evidence in the record" suggesting the motives for Safra's perjury was "subject to conflicting inferences" requiring "further findings of fact." *United States v. Heller*, 830 F.2d at 154, n. 5. The evidence not relied upon in *Heller I* included the following: (1) Safra lied to avoid prosecution; (2) there was a background of animosity between Heller and the Defendants; (3) Plave and Lopez could have intended to intimidate and frighten Safra into falsely testifying as revenge against Heller; and (4) the meeting of July 3, 1979, was the "initial organizational meeting" of the Defendants. *Id.* Importantly, the significance of the governmental misconduct relative to the "other evidence" was not actually decided in *Heller I.* Nor was it decided how each of the Defendants participated in these events. *Williams v. Bennett*, 689 F.2d 1370, 1383 (11th Cir.1982) (prior case finding violation of Eighth Amendment does not estop individual officials from attempting to show lack of individual liability).

■ The Defendants contend that their personal interests were not represented by the United States in the criminal proceedings leading to *Heller I.* For this reason, they assert that *Heller I* should have no preclusive effect here. It is true that one aspect of fairness to the Defendants in applying collateral estoppel is whether they were a party to the first action. In *Garza v. Henderson*, 779 F.2d 390, 394 (7th Cir.1985), the Seventh Circuit stated:

> The mere fact that the United States Attorney represented the warden in the habeas corpus action and IDC members in this civil rights action does not establish that the government is the only litigant to this action. Rather, the IDC members, who are being sued in their own individual capacities, are also separate and independent defendants in their own right. The IDC members were not parties to the habeas corpus action, ... and did not participate in, much less control or effect the course of the habeas corpus action's defense.... Thus, ... notions of fairness and basic due process dictate that these persons have an opportunity to defend this [§ 1983] action in court.

*Garza v. Henderson*, 779 F.2d at 394. Thus, a *final judgment* may not bind a party where her interests were not represented at trial. *United States v. Jefferson County*, 720 F.2d 1511, 1518 (11th Cir. 1983). Accordingly, we find that for collateral estoppel purposes, the final judgment in *Heller I*—that the government interfered with Safra's testimony, thereby depriving Heller of his constitutional rights— is not binding on these Defendants in their individual capacities.[12] The extent of governmental interference, particularly with regard to the personal liability of the individual Defendants, is not resolved for purposes of this *Bivens* action.

■ However, based upon the foregoing analysis, we hold that the finding in *Heller I* that Safra perjured himself is dispositive of that same issue in this case. This was not a final judgment that will now bind the

---

12. We note that even under the test of collateral estoppel, the finding of governmental interference in *Heller I* should not be binding here. First, it was not "actually litigated" in *Heller I*—the Eleventh Circuit found that other inferences from the facts were possible. Second, it was not necessary to the reversal of Heller's conviction to conclude anything more than that

Safra lied. *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959) (new trial required if false testimony is reasonably likely to have affected judgment of the jury). Therefore, the finding of governmental interference is not a "necessary and critical part" of *Heller I.*

Defendants. Rather, this is a finding of fact that has already been resolved through extensive litigation. Collateral estoppel is founded in equity. Indeed, this Court has "broad discretion in deciding whether offensive collateral estoppel is appropriate." *Cotton States Mut. Ins. Co. v. Anderson,* 749 F.2d at 666 (*citing Parklane Hosiery,* 439 U.S. 322, at 331, 99 S.Ct. 645, at 651, 58 L.Ed.2d 552, at 562). The general rule under *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) is that "even when issues have been raised, argued and decided in a prior proceeding, ... redetermination of [the] issues [may nevertheless be] warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *See Gjellum v. City of Birmingham, Ala.,* 829 F.2d 1056 (11th Cir. 1987). We harbor no doubts as to the validity and finality of the Eleventh Circuit's ruling in *Heller I.* Given the extensive history of this issue in our courts and the strength of the Eleventh Circuit's opinion, we see no unfairness in allowing the offensive use of *Heller I* as dispositive of Safra's false testimony.[13] *See Deweese v. Town of Palm Beach,* 688 F.2d 731, 734 (11th Cir.1982) (no abuse of discretion in applying collateral estoppel unless "significant likelihood of substantial unfairness" to parties exists).

### B. Absolute Immunity

Absolute immunity protects certain government officials from prosecution. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Its justification in the judicial arena is that certain decisions must be made freely and without fear of personal liability for error. The Defendants argue that Plave's threats to Safra were "made solely in contemplation of his testimony in a criminal proceeding;" thus they are entitled to absolute immunity because their actions are "intimately involved with the judicial phase of the criminal process" (quoting *Imbler v. Pachtman* 424 U.S. at 430, 96 S.Ct. at 995, 47 L.Ed.2d at 143).

*Imbler* held that a prosecutor cannot be held personally liable for her "decisions to initiate a prosecution" or for her presentation of the state's case at trial. *Imbler v. Pachtman,* 424 U.S. at 421, 96 S.Ct. at 990, 47 L.Ed.2d at 138. Derived from common law prosecutorial immunity, absolute immunity affords wide discretion to prosecutors and judges in the conduct of trials and in the presentation of evidence. *Id., See also Fullman v. Graddick,* 739 F.2d 553, 559 (11th Cir.1984) (prosecutor); *Prince v. Wallace,* 568 F.2d 1176, 1178 (5th Cir.1978) (district attorney and attorney general); *Marx v. Gumbinner,* 855 F.2d 783, 789, n. 10 (11th Cir.1988) (prosecutorial duties). But absolute immunity ends with the prosecutor's role as an advocate. Even a prosecutor will lose absolute immunity when her duties are merely investigative. *Imbler v. Pachtman,* 424 U.S. at 430, 96 S.Ct. at 995, 47 L.Ed.2d at 143. Absolute immunity thereby reaches a much narrower aspect of the judicial process than the Defendants envision.

The Defendants, as IRS agents, are not prosecutors, nor are the cases granting absolute immunity to prosecutors helpful to them. Rather, their duties are merely investigative. They gather facts and refer cases to prosecutors, who then decide whether or not to prosecute. Considering these duties, an IRS agent is analogous to a complaining witness at common law—both are detached from the judicial process by the interposition of the prosecutor. For this reason, a complaining witness was not entitled to absolute immunity at common law. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986); *see also, Jones v. Preuit & Mauldin,* 851 F.2d 1321, 1332 (11th Cir.

---

**13.** There is no question that the Defendants would be able to use Heller's conviction, if it had been affirmed, against him in this suit. *Matter of Raiford,* 695 F.2d 521, 523 (11th Cir. 1983) (conviction is sufficiently reliable determination of relevant issue in subsequent civil suit); *U.S. v. Podell,* 572 F.2d 31, 35 (2nd Cir. 1978) (United States may use criminal conviction in subsequent civil proceeding); *Cotton States Mut. Ins. Co. v. Anderson,* 749 F.2d at 666 (litigant may assert collateral estoppel though he was not a party to the prior action). We acknowledge that mutality is not required for fair use of collateral estoppel in federal court. *Matter of Raiford,* 695 F.2d at 523. However, it is an element of fairness that we consider here.

1988) (J. Tjoflat, concurring) (sources of immunity law derive from common law analogues and from Courts' inherent power to remedy constitutional wrongs). It follows that the Defendants, IRS agents, should not be entitled to absolute immunity on the same basis.

The Defendants' reliance on *Keating v. Martin,* 638 F.2d 1121 (8th Cir.1980) is misplaced. In *Keating,* staff members for a state prosecutor were held immune for actions in connection with a criminal prosecution. However, the Defendants here were not working under the direction of a prosecutor. Rather, they initiated their own case against Heller and then referred it to a prosecutor. These actions are not entitled to absolute immunity because they did not involve a decision to prosecute—the Defendants are not being sued, nor could they be, for malicious prosecution. Avoidance of such suits is the primary purpose of absolute immunity. *Imbler v. Pachtman,* 424 U.S. at 421, 96 S.Ct. at 990, 47 L.Ed.2d at 138. *See also, Strength v. Hubert,* 854 F.2d 421 (11th Cir.1988). Therefore, public policy does not support the Defendants plea for absolute immunity.

Accordingly, we find that when IRS agents investigate and refer cases for criminal investigations, they do not enjoy absolute immunity for their actions. *Accord, Cameron v. I.R.S.,* 773 F.2d 126, 128 (7th Cir.1985) (IRS agents are not entitled to absolute immunity). Accordingly, the Defendants' request for summary judgment on the grounds of absolute immunity is denied.

### C. Qualified Immunity

■ Qualified immunity insulates government officials from personal liability for actions within their discretionary authority. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). Whether an official is entitled to qualified immunity requires two inquiries:

(1) whether the law was clearly established at the time of the alleged misconduct; and,

(2) whether the alleged misconduct violated that clearly established law. ·

*Id.* Generally, a government official is entitled to qualified immunity as a matter of law when she acts within her authority. However, if she acts unlawfully, she must act in good faith. In other words, qualified immunity will protect her if a reasonable person in her position would not have known at the time that her conduct was unlawful. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11 Cir.1988) (citing *Harlow v. Fitzgerald,* 457 U.S. at 800, 102 S.Ct. at 2728, 73 L.Ed.2d at 399).

The Defendants here claim that they have met this test. Accordingly, they seek summary judgment on the issue of qualified immunity. They advance two arguments in support of their position: (1) that the applicable laws were not clearly established at the time of the alleged misconduct, and (2) that the Defendants' conduct "did not violate clearly established rights of which a reasonable person would have been aware." In response, Heller argues that genuine issues of fact remain as to these claims thereby precluding summary judgment.

#### 1. Clearly Established Law

■ As to Count I, the Defendants dispute Heller's clearly established constitutional right to present witnesses who will testify truthfully on his behalf.[14] They ar-

---

**14.** The way we characterize the precise legal issue involved in Heller's claim must be as fact specific as possible. In *Anderson,* the Court was concerned that a plaintiff might use artful pleading to win on the qualified immunity issue by framing the legal issue broadly. This in turn may deprive a defendant of qualified immunity protection by increasing the likelihood that laws prohibiting that conduct would have been in effect at the time.

The record in this case shows that the Defendants told Safra that he might be subject to criminal charges, that Safra's attorney met pri-

vately with Plave, that Kaplan took notes of and knew of Safra's earlier testimony acknowledging the case-closed method, and that the Eleventh Circuit held that Safra had perjured himself at Heller's trial. Based upon this record, we find that the legal issue involved here is Heller's right to have Safra testify truthfully at his criminal trials. The factual issue is whether the Defendants interfered with this right. The legal issue framed in this way is not so broad that qualified immunity is "transformed from a guarantee of immunity to a 'rule of pleading'." *Anderson* at 3039.

gue that *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967) (right to present witnesses in one's defense is a fundamental element of due process) only established "broad contours of the right to compulsory process." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Defendants also question the existence of clearly established laws prohibiting threats and intimidations of a prospective defense witness. They assert that the "precise dimensions [of the right to present a defense witness] remained murky" until 1982, when the "inquiry was narrowed" in *Valenzuela–Bernal. See also, U.S. v. Hoffman,* 832 F.2d 1299, 1302–03 (1st Cir. 1987).

A survey of the law in effect on July 13, 1979, when Safra was threatened and intimidated, shows the Defendants' contention to be unpersuasive. At that time, cases clearly held that certain types of governmental interference can deprive a defendant of his right to present defense witnesses. *E.g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (remarks of trial judge intimidated defense witness); *United States v. Hammond,* 598 F.2d 1008, 1013 (5th Cir.1979) (defense witness reasonably interpreted FBI agent's comments as threats to retaliate if he testified); *United States v. Henricksen,* 564 F.2d 197, 198 (5th Cir.1976) (defense witness intimidated by plea bargain); *United States v. Morrison,* 535 F.2d 223, 227–228 (3rd Cir.1976) (defense witness intimidated by remarks of U.S. attorney); *United States v. Thomas,* 488 F.2d 334 (6th Cir. 1973) (secret service agent threatened prospective defense witness). Moreover, the rule in 1979 in the Eleventh Circuit (as the former Fifth Circuit) was that "substantial government interference with a defense witness' free and unhampered choice to testify violated due process rights of the defendant." *United States v. Hammond,* 598 F.2d at 1012 (citing *Henricksen,* 564 F.2d at 197).

Nor are we persuaded that the facts before us do not fall within the general principles already in place by 1979. The right to present a defense witness was articulated by the Supreme Court ten years

before the events in this case occurred. *Cf. Todd v. United States,* 849 F.2d 365, 371 (9th Cir.1988) (IRS agents would not have known of law that was one year old and ambiguous because no factually relevant cases existed and no courts had interpreted the provision). Accordingly, the contours of the right to present defense witnesses were not so broad as to preclude giving notice that threats and intimidations of defense witnesses were illegal.

As to Count II, the Defendants do not question the existence of clearly established laws prohibiting the use of known false testimony in the pursuit of a criminal conviction. *E.g., Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791, 794 (1935) (deliberate deception of the court and jurors by presentation of known false evidence is incompatible with "rudimentary demands of justice"); *Pyle v. State of Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 178, 87 L.Ed. 214, 216 (1942) (known use of coerced or perjured testimony is a violation of constitutional rights); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959) (allowing false testimony to appear uncorrected is against "rudimentary demands of justice"); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963) (suppression of material false evidence justifies a new trial irrespective of good faith or bad faith): *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (whether nondisclosure of material evidence is by negligence or design, failure to disclose is responsibility of prosecutor).

In light of the foregoing, a reasonable person in the Defendants' position would have known that interference with a witness and use of known false testimony would be violative of Heller's constitutional rights. *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990) (knowledge imputed when all reported cases held the same way). Any reasonably competent IRS agent trained to detect fraud in tax returns would realize that her own deception, whether intimidating a witness into changing his testimony or using false testimony, would trigger liability under *Washington v. Texas* and *Napue v. Illinois.* Moreover, each

Defendant had notice of the constitutional rights of prospective defendants through various IRS manuals.[15]

Accordingly, we find that during the IRS investigation of Heller, it was clearly established law that interference with a witness and use of known false testimony would violate Heller's constitutional rights.

### 2. Whether the Conduct Alleged Violated Clearly Established Law

We now consider whether Heller's allegations as to the Defendants' conduct if proven at trial, would constitute a violation of clearly established law.[16] We must determine whether a reasonable person in the Defendants' position would have known that their conduct, as alleged, constituted interference with a witness and use of known false testimony so as to violate Heller's rights. To prevail, Defendants must prove their good faith and no genuine issue of fact can remain. We consider each count separately.

a. *Count I.* To determine whether a reasonable person would have known that the threats to Safra amounted to interference with a witness, we first consider what was apparent to each Defendant as they acted. The Defendants do not argue their roles separately. However, in fairness, we will examine the conduct of each defendant independently for evidence of their good faith.

 Our inquiry as to Plave is whether his undisputed threats of prosecution and intimidation of Safra constitutes "interference." Interference occurs when a defense witness may reasonably interpret a government official's comments as threats of prosecution and when the witness changes her testimony in response thereto. *U.S. v. Hammond,* 598 F.2d at 1013 (FBI agent interfered when he threatened defense witness with "nothing but trouble," causing one witness not to testify further and another witness not to testify at all). Under this test, Plave's conduct amounts to interference. Interference may also occur when improper promises or inducements are made to a witness in exchange for a statement implicating a defendant. *Wilcox v. Ford,* 813 F.2d 1140, 1148 (11th Cir.1987), *cert. denied* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987). The record shows that Plave met with Safra's attorney and allegedly promised not to prosecute Safra if he testified against Heller.

 A jury could find that a reasonable person in Plave's position would have known that his threats constituted interference with Heller's Fifth and Sixth Amendment rights. Accordingly, we conclude that a genuine issue of fact remains, and deny Plave's appeal for qualified immunity as to Count I. *See United States v. Miller,* 491 F.2d 638, 647 (5th Cir.1974) (whether prosecutorial misconduct amounted to duress was question of fact, not law). *See also United States v. Accetturo,* 858 F.2d 679, 681 (11th Cir.1988).

We now turn to Lopez, a supervisor of the other Defendants, and ask whether his

---

15. *See* "Handbook for Special Agents," §§ 241, 241.1 241.2, effective March 1, 1977. Special Agents are not authorized to intimidate, threaten or deceive any person they interview. *Id.* § 242.132(6), effective March 1, 1977. Moreover, Special Agents must act impartially, and should consult with Group Managers whenever their actions may raise legal issues. Internal Revenue Manual–Administration, Part IX–Criminal Investigations, § 8382.1(1) and (6), effective February 8, 1979. As to Lopez, part of his responsibilities as Group Manager include "keeping abreast of legislation and court decisions. Internal Revenue Manual–Administration, Part IX–Intelligence, Ch. 220(1)(c), effective January 26, 1979.

16. The Defendants seek qualified immunity to avoid trial. To succeed, they must be entitled to qualified immunity as a matter of law. We therefore assume an outcome of the trial in Plaintiff's favor. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("We emphasize at this point that the appealable issue is a purely legal one. Namely, whether the facts alleged ... support a claim of violation of clearly established law.")

Clearly, a genuine issue of material fact exists as to whether the Defendants did what Heller alleges. Whether the Defendants threatened or intimidated Safra into testifying falsely about his knowledge of Heller's accounting methods and whether the Defendants knew Safra was testifying falsely are questions for the jury. These factual disputes, however, do not preclude summary judgment if Heller's complaint does not allege a violation of clearly established law. If Heller fails to meet this threshold requirement, any factual disputes are not "material."

presence, when Plave threatened Safra, constituted interference. The record indicates that Lopez failed to take action to stop Plave's threats. In fact, there is some suggestion that Lopez even encouraged Plave. A supervisor can be held liable for civil rights violations where his "conduct is causally related to the constitutional violation committed by his subordinate." *Greason v. Kemp*, 891 F.2d at 836 (*citing, Wilson v. Attaway*, 757 F.2d 1227, 1241 (11th Cir.1985)) (personal participation is not required to impose liability for a civil rights deprivation. There must be some causal connection between the actions of the superior and the alleged deprivation); *see also Rizzo v. Goode*, 423 U.S. 362, 375–76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561, 572 (1976) (for liability under § 1983, supervisory officials must have direct responsibility for actions of officials who had engaged in misconduct). A jury could find that a reasonable person in Lopez's position would have known that his failure to stop Plave's threats would constitute interference with Heller's Fifth and Sixth Amendment rights. We conclude that a genuine issue of fact remains, and accordingly deny Lopez's appeal for qualified immunity as to Count I.

■ Our inquiry into Kaplan's actions is more difficult. Kaplan was not present when Plave threatened Safra. She testified that she did not recall being told of the specifics of those meetings. Heller contends that Kaplan was in fact made aware of the threats; or in the alternative, her knowledge as a co-conspirator must be inferred. The record shows that Kaplan participated in the July 3, 1979 meeting and was an integral part of the Heller investigation. A jury could conclude that a reasonable person in Kaplan's position would have known that her participation in the "conspiracy" to deprive Heller of his reliance defense constituted interference with Safra's testimony. Accordingly, we deny Kaplan's claims of qualified immunity as to Count I.

■ b. *Count II.* We now determine whether a reasonable person in the Defendants' position would have known that the

failure to disclose Safra's conflicting testimony constituted the use of known false testimony so as to deprive Heller of a fair trial. Heller's claims focus on two events: Safra's early testimony (to the IRS acknowledging the case-closed method) and Safra's later testimony (including Heller's criminal trials) denying any such knowledge. The record shows that Safra first acknowledged Heller's case-closed method to Kaplan when she began the civil audit and made the original notes of Safra's early testimony. Plave then spent ten to sixteen hours reviewing those notes. Lopez reviewed Kaplan's referral report, which was prepared from those notes. Lopez, Plave and Kaplan then sat in on the August 17, 1979, interview in which Safra contradicted those earlier notes. Thus, all three Defendants were familiar with Safra's early testimony, and were present when Safra initially changed his story.

■ The Defendants suggest that their "knowledge of a prior inconsistent statement" does not mean that they knew Safra was lying. It is true that undisclosed evidence must be material, and must be "likely to have changed the verdict" to warrant a new trial. *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir.1968). Heller's defense at trial was that he relied upon Safra's expertise. For Safra to subsequently testify that he did not know of Heller's accounting methods is clearly material to this defense. Moreover, the Eleventh Circuit's holding in *Heller I* made it clear that Safra's testimony was material to Heller's conviction.

A jury could find that a reasonable person in Lopez, Kaplan or Plave's position would have known that their knowledge of Safra's inconsistent statements would constitute the use of known false testimony. We therefore deny the Defendants' request for qualified immunity as to Count II.

### D. *Res Judicata*

■ The Defendants contend that the final judgment in *Heller v. Plave*, 657 F.Supp. 95 (S.D.Fla.1987) bars Heller from bringing this *Bivens* claim.[17] The record

---

17. The federal common law of res judicata determines the preclusive effect of a federal court

judgment on a subsequent federal court case.

shows that Heller initially sued Plave for disclosing unnecessary information to Heller's former clients and other parties regarding the IRS investigation of Heller's tax returns. Heller now sues Plave and others for interfering with his right to have his accountant testify truthfully on his behalf at trial. The issue here is whether the unlawful disclosure action is the same "cause of action" as the *Bivens* action now before us.[18]

■ The Eleventh Circuit utilizes four tests in comparing causes of action:

(1) primary rights and duties;

(2) nature of the wrongs or violations;

(3) operative nucleus of fact; and

(4) same transaction or series of transactions.

*I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1549 (11th Cir.1986) (primary rights and duties); *White v. World Finance of Meridian Inc.*, 653 F.2d 147, 150 (5th Cir.1981) (different wrongs); *Hart v. Yamaha–Parts Distributors, Inc.*, 787 F.2d 1468, 1470 (11th Cir.1986) (operative nucleus of fact); *John Alden Life Ins. Co. v. Cavendes*, 591 F.Supp. 362, 367 (S.D.Fla. 1984) (same transaction).

■ 1. *Primary Rights:* Heller contends that his statutory right to taxpayer privacy is not the same substantive right as his constitutional right to due process and to a fair trial. The taxpayer privacy statute, 26 U.S.C. § 6103, protects Heller's reasonable expectations that the IRS will keep any information about his tax returns confidential. *Heller v. Plave*, 657 F.Supp. at 98, (*citing Johnson v. Sawyer*, 640 F.Supp. 1126, 1132 (S.D.Tex.1986)). By contrast, the Fifth and Sixth Amendments of the United States Constitution protect Heller's rights to have a witness testify truthfully on his behalf.

*Thomas v. Evans*, 880 F.2d 1235, 1240 (11th Cir.1989).

18. A prior judgment bars a subsequent action as res judicata when three requirements are met:
(1) a court of competent jurisdiction issues a final judgment on the merits;
(2) the parties, or those in privity with them, are identical; and
(3) the same cause of action or claims are involved.

■ For res judicata purposes, different primary rights are at stake where the substance of the two claims differ. *I.A. Durbin*, 793 F.2d at 1549 (in replevin action, different rights are at stake in contempt proceeding in bankruptcy court and in constitutional right to due process and to be free of unreasonable search and seizure); *S.E.L. Maduro v. M/V Antonio de Gastaneta*, 833 F.2d 1477 (11th Cir.1987) (different rights created by statute authorizing *in rem* and *in personam* actions for maritime lien); *Olmstead v. Amoco Oil Co.*, 725 F.2d 627 (11th Cir.1984) (different rights involved in claims for fraudulent inducement (sale) and fraudulent misrepresentation); *see also, Ray v. Tennessee Valley Authority*, 677 F.2d at 821–822 (same right of continued employment involved in administrative review of termination decision and suit for breach of employment contract); *Olmstead v. Amoco Oil Co.*, 725 F.2d at 631 (same right of possession involved in eviction proceeding and lease enforcement action); *Jaffree v. Wallace*, 837 F.2d 1461, 1469 (11th Cir.1988) (same rights raised in both First Amendment challenges).

In this case we find different federally protected rights at stake. The substance of the first action was privacy and the second is a fair trial. Therefore, the earlier judgment in *Heller I* does not bar this *Bivens* action under the "different rights" test of res judicata.

■ 2. *Different Wrongs or Violations:* The Defendants argue that Plave's "consistent pattern of stonewalling evidence and witnesses," as alleged in *Heller v. Plave*, constitutes the same wrong complained of here. Res judicata applies, they contend, because Heller is in essence split-

*Ray v. Tennessee Valley Authority*, 677 F.2d 818, 821 (11th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983).

Clearly the first element, a competent judgment on the merits, is met. As to the second element, Defendants argue that "privity" exists between Plave and Kaplan and Lopez. Because we find that a different cause of action is now presented, we need not reach this privity issue.

ting his claim for relief based upon the same wrongful conduct.

■ It is true that different federally protected rights do not in themselves define different actionable wrongs. However, statutes that prohibit different conduct provide evidence of different wrongs for res judicata purposes. *White v. World Finance of Meridian, Inc.*, 653 F.2d at 150 (different wrongs are involved because violation of Truth–In–Lending Act would not constitute violation of state statute for collection on a note). The taxpayer privacy statute prohibits an IRS agent from expressing personal views as to the merits of a case, divulging information that would jeopardize the successful conclusion of an investigation, or injuring the reputation of a citizen. Internal Revenue Service Manual—Administration, Investigative Procedures, § 9382.1(3) and (4), § 9382.2, *cited in Heller v. Plave*, 657 F.Supp. at 98. By contrast, in the pursuit of due process rights, it is wrong for an agent to be less than completely impartial in his investigation. IRS Manual—Administration (CCH), § 9382.1(1). Moreover, it is wrong for a special agent to threaten or intimidate a tax preparer. IRS Special Agents' Manual Regulation 142.132(b). The privacy statute and the IRS regulations describe different wrongs by defining different wrongful conduct.

Accordingly, we conclude that Heller raises different actionable wrongs—unnecessary disclosure and biased judgment or intimidation—in each cause of action. A judgment in this *Bivens* action would not contradict the judgment in *Heller v. Plave*. Stated simply, a violation of Heller's right to privacy is not a violation of his right to a fair trial. Therefore, this *Bivens* action is not barred under the "different wrongs" test of res judicata.

■ 3. *Operative Nucleus of Fact:* The Defendants urge that the ongoing misconduct of the IRS agents conducting the audit of Heller's tax returns provides the same operative nucleus of fact as this *Bivens* action. Defendants argue that in both actions, Heller makes the same allegations that threats were made to Safra by Plave and Lopez. In support of their position, Defendants note that both complaints

cite the same personal vendetta as the genesis for all ensuing criminal and civil litigation involving Heller. Therefore, Defendants urge that Heller's attempt to prove malice herein, having failed in *Heller v. Plave* to prove entitlement to punitive damages, is now merely recharacterized under a new theory of liability.

The Eleventh Circuit uses the "operative nucleus of fact" standard when the same evidence is at the core of both claims. *See e.g., Olmstead v. Amoco Oil Co.*, 725 F.2d at 631 (validity of lease is at core of both eviction and lease enforcement actions); *Hart v. Yamaha–Parts Distributors, Inc.*, 787 F.2d at 1470 (defect in design giving rise to motorcycle accident is at core of actions in negligence and breach of warranty). Of concern is judicial economy. Needless to say, it is a duplication of effort to undertake the same fact-finding twice. Moreover, res judicata extends beyond what was actually litigated in the first action to include what might have been litigated. The "operative nucleus of fact" test reveals when a plaintiff has fragmented her case into component claims in violation of the finality of the first judgment. Friedenthal, Kane and Miller, *Civil Procedure*, § 14.3 (1985).

■ Both claims at issue here are rooted ultimately in the Heller audit; both depend in part on the motivation and conduct of Plave in discharging his professional duties. However, "a cause of action does not consist of facts, but of the unlawful violation of the rights which the facts show." *Baltimore Steamship Co. v. Phillips*, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927). The number and variety of facts alleged may establish more than one cause of action without offending res judicata policies.

■ Here, the same facts—the Heller audit and alleged IRS misconduct—contain different actionable conduct. The unlawful disclosure case did not concern Plave's contact with Safra, nor did it concern Plave's interference with a witness and use of known false testimony. The fact that Plave's motivation and conduct have been previously presented in some form to a jury is not grounds for excluding these

facts in this *Bivens* action. That is, testimony that may overlap in two trials is not dispositive of a res judicata claim. *Wu v. Thomas,* 863 F.2d 1543, 1548–1549 (11th Cir.1989) (res judicata does not bar a second action for retaliation despite appellant's claim that testimony in the first trial touched on retaliatory action). Nor are the dangers of litigating claims twice implicated here. Inconsistent judgments might result in cases like *Hart* or *Olmstead* if the cause of a motorcycle accident or the validity of the lease were litigated twice. Inconsistent judgments are not possible here: the existence of malice in the unlawful disclosure action is not dispositive of malice in the *Bivens* action.

■ Heller also argues that his *Bivens* claims had not accrued when *Heller v. Plave* was decided: Moreover, even if based on similar facts of ongoing misconduct, these claims were "not previously available," and are thus not barred by res judicata. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). The law supports Heller's view that a new claim may be created even as ongoing misconduct continues, and rejects the broad reading of the "operative nucleus of fact" standard favored by the Defendants. *Thomas v. Evans,* 880 F.2d 1235, 1241 (11th Cir.1989) (ongoing misconduct of prison officials is not same nucleus of fact precluding litigation of separate claims as they arise); Wright and Miller, *Federal Practice and Procedure,* § 4409 and cases cited therein.

On this basis, we hold that the alleged genesis of both of Heller's actions—a personal vendetta—is not the operative nucleus of fact that would preclude litigation of two claims arising from the Defendants' misconduct. Therefore, Heller's *Bivens* action is not barred by res judicata under the "operative nucleus of fact" test.

■ 4. *Same Transaction.* The Defendants urge that the Heller audit was a single transaction, and that multiple claims arising from the audit should be barred.

*Restatement* (Second), Judgments, § 24. Heller does not respond to this argument.

The "same transaction" analysis envisions the broadest view of res judicata. Wright & Miller, *Federal Practice and Procedure* § 4407. This District Court adopted the Restatement test in *John Alden Life Ins. Co. v. Cavendes,* 591 F.Supp. 362, 367 (S.D.Fla.1984), where a compulsory counterclaim was barred when plaintiff failed to assert it in the first suit. These unique facts presented a narrow and practical use of the Restatement test—to preclude the untimely assertion of a compulsory counterclaim. Friedenthal, Kane and Miller, *Civil Procedure,* § 14.4 (1985).

■ The Restatement test, although the modern view, has not been broadly applied in this Circuit. The parties cite no cases foreclosing future suits for damages when one suit is filed in the middle of a "transaction." It makes no sense that a litigant must wait for ongoing misconduct to conclude before bringing suit to avoid preclusion on all future claims. By virtue of its roots in procedural concerns, the transaction test cannot bar claims that extend beyond or occur after that first suit. Therefore, the modern trend towards the transaction test does not, in itself, warrant consideration of the Heller audit and the ongoing misconduct of the IRS agents as one "transaction." Moreover, even if the audit were considered one "transaction," there was a change in circumstances after the first suit and before the "transaction" was completed. Namely, Heller was convicted, his convictions were reversed on appeal, and the indictment was dismissed. Even under the transaction test, the litigation of Heller's claims as they arose is not barred. Therefore, Heller's *Bivens* action is not barred under the "same transaction" test of res judicata.

### E. Statute of Limitations

■ The parties do not dispute that Florida's four-year statute of limitations governs this claim.[19] Nor do they dispute

---

**19.** Federally created causes of action without their own limitations period follow the statute of limitations of the state most connected with the claim. *Smith v. Cremins,* 308 F.2d 187, 189 (9th Cir.1962). This *Bivens* action is analogous to a malicious prosecution action, and other courts have applied the limitations period governing personal injury claims. *Wilson v. Gar-*

that Heller filed this action on March 28, 1989. Consequently, they also agree that Heller's claims are barred if they accrued prior to March 28, 1985.

Our review of the record indicates that the following events occurred prior to March 28, 1985:

(1) the meeting of July 13, 1979 when the alleged intimidation of Safra took place;

(2) Heller's first trial on August 25, 1983; and

(3) Heller's first conviction on November 10, 1983.

The first event, the intimidation, is the factual basis for Count I, interference with a witness. The second and third events pertain to damages. Each event, if sued upon separately, would be barred by the statute of limitations if we used the dates of each event as the accrual date.

■■■ The parties therefore dispute when Heller's claims accrued. Heller contends they accrued on April 28, 1988, when the district court dismissed the indictment against him. Alternatively, he asserts that the claims accrued on March 21, 1988, when the Eleventh Circuit reversed his criminal conviction. The Defendants contend that the accrual date for the entire claim was July 13, 1979, when the "original violation"—the alleged intimidation of Safra—took place. Safra's perjured testimony was a consequence of those threats, not a continuing wrong that extends the accrual date.

The Defendants cite several employment termination cases in support of their position. In such cases, the claims accrue as of the date the plaintiff is fired. *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir.1981);

*Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6, 9 (1981); *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431, 440 (1980). In a similar vein, the Defendants cite *Altair Corp. v. Pesquera de Busquets*, 769 F.2d 30, 32 (1st Cir.1985) (in a § 1983 action for unlawful taking of property, the limitation period begins to run on the date of the wrongful appropriation), and *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir. 1984) (in § 1983 conspiracy claims, the limitation period runs from the date of the wrongful acts that preceded plaintiff's conviction). These cases hold that discrete acts are completed and therefore accrue when they occur.

■■■ We decline to extend this reasoning to a case based upon a civil conspiracy.[20] Here, the wrongful acts are not discrete. The alleged conspiracy continued through two criminal trials based on false testimony. *Altair Corp. v. Pesquera de Busquets*, 769 F.2d at 33 (no subsequent wrongful acts after unlawful appropriation alleged); *S.W. Daniel, Inc. v. Urrea*, 715 F.Supp. 1082, 1087 (N.D.Ga.1989) (no "further actionable misconduct" perpetuated original harm); *Compton v. Ide*, 732 F.2d at 1433 (no occurrences alleged after original conduct); *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6, 9 (no allegations of illegal acts subsequent to termination decision). Contrary to Defendants suggestions, these were not simply "continual ill effects from an original violation." *Ward v. Caulk*, 650 F.2d 1144, 1147 (continuing nonemployment resulting from unlawful termination is not continuing violation) *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6, 9. Sepa-

*cia*, 471 U.S. 261, 266–267, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254, 260 (1985).

20. The record shows that Heller offers sufficient evidence to support his civil conspiracy theory. According to Heller, the Defendants agreed to preclude Heller's use of a reliance defense by depriving him of the truthful testimony of his main witness, furtherance of the conspiracy, resulting in actual deprivation of Heller's constitutional rights. These acts resulted in injury to Heller in the form of defense costs, lost income and loss of civil rights. Therefore, the necessary elements of civil conspiracy have been

plead. *See Armbrister v. Roland Intern. Corp.*, 667 F.Supp. 802, 809 (M.D.Fla.1987); *Scherer v. Balkema*, 840 F.2d 437 (7th Cir.1988), *cert. denied* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620.

The statute of limitations in a *Bivens* action for damages arising from civil conspiracy bars any claims of damages preceding the limitations period. However, the agreement is not time barred even if entered into outside the statutory period. *Scherer v. Balkema*, 840 F.2d at 442 (agreement and overt acts causing damage are separate components of civil conspiracy).

rate actionable conduct occurred repeatedly from the 1979 meeting through the 1986 trial.

In keeping with the ongoing nature of Heller's ordeal and the persistent pattern of alleged misconduct, we adopt the reasoning of the Ninth Circuit in *Venegas v. Wagner*, 704 F.2d 1144, 1146 (9th Cir.1983). In *Venegas*, a claim arising from a civil conspiracy accrued not with the wrongful act, but with the "primary injury." [21] Plaintiff's conviction for murder was reversed on appeal. In a subsequent civil rights action under § 1983 the Ninth Circuit held that his claim accrued when his conviction was reversed, not when the defendants secured his conviction by tampering with witnesses and using known false evidence. Reasoning that conduct which "distort[s] the integrity of the truth finding process and thus [denies] a fair trial" is not a discrete injury requiring use of the "last overt act" test for accrual, the Court held that such a claim accrues when the plaintiff is freed from his wrongful conviction. *Venegas v. Wagner*, 704 F.2d at 1146, *citing Cline v. Brusett*, 661 F.2d 108, 111–112 (9th Cir.1981) (claims of bribery of witnesses and perjury were analogous to malicious prosecution and accrued when wrongful conviction was reversed on appeal). *See also Prince v. Wallace*, 568 F.2d 1176, 1178 (5th Cir.1978) (claim accrues when a motion for reconsideration of final appeal was ruled upon).

We acknowledge the tension between our ruling and the federal policy of promoting a limitation of actions where loss of evidence, death or disappearance of witnesses and fading memories are of concern. *See Hawthorne v. Wells*, 761 F.2d 1514, 1516 (11th Cir.1985). However, these concerns are simply not implicated here. Heller's most recent conviction, just three years ago, kept alive both the evidence and the ongoing alleged misconduct of the Defendants. Therefore, we agree with the Ninth

Circuit in *Venegas*, and hold that Heller's allegations of intimidation of Safra and his damage claims stemming from his first trial and conviction are not time-barred.[22] We conclude that Heller's claims did not accrue until March 21, 1988, when the Eleventh Circuit reversed his convictions. Therefore, Heller's claims are not barred by the four year statute of limitations.

### F. Judicial Estoppel

■■■ Judicial estoppel is a rule of procedure under which a party is estopped from taking a position contrary to that taken in prior proceedings. *Johnson Service Co. v. Transamerica Insurance Co.* 485 F.2d 164, 174 (5th Cir.1973) (*citing* C.J.S. Estoppel § 121). Judicial estoppel "is directed against those who would manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings." *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1261 (11th Cir.1988) (*citing Johnson Service So.*, 485 F.2d at 175).

■■■ The Defendants contend that Heller's suit against Safra in 1981 bars his present claims under judicial estoppel. In the 1981 suit, Heller claimed that Safra and his firm gave perjured testimony before the IRS. According to Heller, Safra lied to protect his professional reputation, to save his accounting license, to avoid preparer penalties, and to create a defense to this lawsuit. The Defendants urge us to apply judicial estoppel because Heller now offers yet another reason why Safra lied—because the Defendants intimidated him.

The Defendants ignore the express purpose of judicial estoppel, that being to preclude the "calculated assertion" of "divergent" or "inconsistent" positions. *See e.g. Chrysler Credit Corp.*, 842 F.2d at 1261; *American Nat. Bank of Jacksonville v. Fed. Dep. Ins. Corp.*, 710 F.2d 1528 (11th Cir.1983); *DeShong v. Seaboard Coast*

---

**21.** To the extent that *Compton*, 732 F.2d at 1433, holds to the contrary, we decline to follow it. However, *Compton* is distinguishable because there, the conspiracy was of short duration; no wrongful acts were alleged after the plaintiff's conviction. Here, Heller had a second trial in which the wrongful conduct was repeated.

**22.** The agreement—the July 3, 1979 meeting—is not time barred even though entered into outside the statutory period. *Scherer*, 840 F.2d at 442 (agreement and overt acts are separate components of civil conspiracy).

*Line R. Co.,* 737 F.2d 1520 (11th Cir.1984); *Johnson Service Co.,* 485 F.2d at 175. A representation that Safra lied to save his reputation is not inconsistent with a claim that he was also motivated by the Defendants' intimidation and threats of prosecution. These two positions are consistent. Heller does not deny that Safra was motivated by several factors. Thus, his present position is not exclusive of his position in 1981.

Because inconsistency is the crucial element of the doctrine of estoppel, there is no basis for applying estoppel in this case. *DeShong v. Seaboard Coast Line R. Co.,* 737 F.2d at 1520.[23] Accordingly, the defense of judicial estoppel is completely devoid of merit.

### G. Election of Remedies

The Defendants contend that when Heller sued Safra in 1981, he thereby elected that remedy over the alternative remedy of suing the Defendants. Heller is now barred, they contend, from seeking double recovery, having received five million dollars for his accounting malpractice suit against Safra.

 A litigant must elect among simultaneously available mutually exclusive remedies when she first brings suit. She cannot later sue on a remedy she had rejected in a prior action. *See e.g., Landry v. Carlson Mooring Service,* 643 F.2d 1080, 1087 (5th Cir.1981). Two major concerns underlie the election of remedies doctrine. One is remedial and the other is preclusion by judgment. Double recovery cannot be gained by a plaintiff for a single injury. Likewise, double liability cannot be imposed on a Defendant for the same act. 18 Wright & Miller, *Federal Practice and Procedure* § 4476 (1981).

 Double recovery is not present here because the accounting malpractice and civil rights actions arose from different injuries with distinct damage claims. The state law claims arose from the profession-

al duties Safra owed to Heller. Whereas, this *Bivens* claim arises from the constitutional duties owed to Heller by the Defendants. There are different damages, none of which are mutually exclusive. Nor is there double liability being imposed on a Defendant for the same act. No preclusion by judgment issue is raised, and the pursuit of remedies against Safra does not foreclose remedies against other Defendants (the IRS agents). *Id.* Moreover, when Heller sued Safra he did not elect a remedy from among others that were simultaneously available. The civil rights injuries alleged here accrued six years later, during Heller's criminal trials.

On this basis, the principle of election of remedies is irrelevant to Heller's *Bivens* claim. Accordingly, the Defendants' motion for summary judgment on this ground is denied.

### IV. CONCLUSION

Based upon the foregoing analysis and the authorities cited therein, it is hereby ORDERED and ADJUDGED as follows:

1. *United States v. Heller* 830 F.2d 150 (11th Cir.1987) is binding on these parties to the extent that the finding that Safra committed perjury is dispositive of that same issue in this trial.

2. The Defendants are not entitled to absolute immunity.

3. The Defendants are not entitled to qualified immunity.

4. *Heller v. Plave,* 657 F.Supp. 95 (S.D. Fla.1987), does not bar Heller from bringing this action on the basis of res judicata grounds.

5. Florida's four-year statute of limitations does not bar Heller's damage claims.

6. Judicial estoppel does not bar this action.

7. Election of remedies does not bar this action.

---

23. Heller also asserts, correctly, one other ground for denying the use of judicial estoppel. Heller had no knowledge of the facts he now asserts when he sued Safra. It was during his criminal trials that Heller learned from records and testimony of these facts. *Walker v. American Motorists Ins. Co.* 529 F.2d 1163 (5th Cir. 1976) (plaintiff had no knowledge of facts that should have led them to take a different position in first suit); *DeShong,* 737 F.2d at 1522.

Upon careful consideration, the Defendants' Motion for Summary Judgment is DENIED.

DONE and ORDERED.